ORIGINAL

**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

FILED

MARCH 5, 2014

Ideker Farms, Inc.; Lynn and Elaine Binder, Todd
and April Binder, and Tyler and Valerie Binder;
Richard Binder, Dustin Binder, and Darwin
Binder dba Midwest Grain Co.; Eddie Drewes,
Robert W. Drewes Recoverable Trust, Rita K.
Drewes Recoverable Trust and David Drewes,
individually and dba Drewes Farms, Inc.; Patrick
Newlon dba Newlon Farms, Inc.; David Newlon
dba D Double N Farms, Inc.; Jason Taylor and
Brad Taylor dba H.B.J. Farms, Inc.; Lyle Hodde
dba Hodde & Sons Limited Partnership; Gerald
Schneider dba Buffalo Hollow Farms, Inc.; Steve
Cunningham, Trustee of the Doris J. Cunningham
and Steven K. Cunningham Declaration of Trust;
Gail Cunningham dba Cunningham Farms, Inc.;
Charles and Connie Garst, individually and dba
Garst Farms, Inc.; Ron and Mary Schneider; Scott
and Susan Olson; Tevan Markt and Tom Markt
dba T&T Farms, Inc.; Leo Ettleman; David and
Kimberly Sieck; Arthur and Diane Sieck; Aaron
Luce dba Aaron Luce Farm Company; Bryce
Andersen dba Andersen Family Farms, Midwest
Investments, LLC, Andersen Farms, Inc. and
Engra Andersen; Brett Derr dba Lyle Derr Farm
Co.; Brandon Roup dba Roup Farms, LLC;
William and Sharon Sheldon, individually and dba
Sheldon-Frederick, LLC; Patrick and Angela
Sheldon; James Group dba Triple G Farms
Partnership; Philip and Charla Graves; Harry
Larson dba L&H Investments, Inc.; Rickey
Gillenwater dba Young Farms, Inc.; Dennis
Erickson dba Erickson Farms, Inc.; Wayne
Johnson, Trustee of the Robert Stoxen Trust;
Mark Poulosky; Bruce and Leisa Biermann,
Trustees of the Biermann Living Trust; Leslie
Albrecht dba L&E Farms General Partnership;
Dennis and Betty Reagan; Shane and Billie
Reagan; Dennis Hendrickson, Trustee of the
Dennis and Patricia Hendrickson Family Trust;

Case No.:    14-183 L

Darin Hendrickson; Douglas Johnson dba Johnson
Ag, Inc. and Johnson Farms, Inc.; Douglas
Johnson, Craig Johnson and David Johnson dba
DCD Farms; Brian and Kelly Johnson dba KMJ
Farms, Inc.; Richard Lee, Richard Lee, Jr. and
Janice Lee Bucman; Edward and Diane Foral;
John Tyson dba Tyson's Inc.; James Gerking dba
Entire Recycling, Inc.; John D. Whetstine; John R.
and Virginia Whetstine, individually and dba
Whetstine Farms, Inc.; Gary Schemmel and
Robert Schemmel; Lance Schuler, Trustee of the
Joan Schuler Revocable Trust; Lanny and Ramona
Frakes; L. Bret Broderson dba Broderson Farms,
Inc.; Kevin Brummond; Stanley Griffin dba
Griffin Farms Partnership; Richard Archer; Paul
Dailey; Robert Olson and Mike Olson; Steve
Marlatt dba Marlatt Brothers, LLC; Thomas
Marlatt dba Marlatt Farms, LLC; Golden Triangle
Energy, LLC; Jeff and Melinda Holstine; Dale and
Marcina Holstine; Lynn Handy dba Handy Farms,
Inc.; James Olson dba James L. Olson Farms, Inc.;
Mike Lyons dba Lyons Enterprises, Inc. and
K&M Lyons, Inc.; Doug Lyons dba Lyons Farms,
Inc.; Neale and Laura Shaner, individually and
dba Shaner Family Farm, Ltd.; Neale Shaner,
Trustee of the G. Neale Shaner Titleholder Trust;
Jeff Shaner dba Neale Farms, Inc. and C.E.M.
Shaner Farms, LLC; Gerhardt Thompson dba
T&T Trucking, Inc.; Randy and Sharon
Thompson; Daniel Rohde; Timothy Gregerson
dba G&G Bottom Farms, LLC; Emanuel Weber
dba Weber Farms, Inc.; John and Edna Burch dba
NotByLuck, LLC; Glenn Payne; Delores Payne
dba DK Payne Investments, Ltd.; Rodney and Jill
Finnell dba R&J Finnell Farms, LLC; Rick and
Rebecca Jones; Warren and Peggy Jones; Brit
Liljedahl dba Sabel Farms, Inc.; Kenneth
Munsterman and Bobby Munsterman dba
Munsterman Brothers; Evan Copsey dba Copsey
Farms; David Meyerkorth; Doug Shirley dba
Triangle Enterprises, Inc.; Duane and Jolee Craig;
Mike Foley; A. Douglas Kwikkel dba Royal Rock
Investments, LLC; Larry Elliott; Timothy Lee;

2

Marvin Green Trustee of the Alma Green Trust;
Susanne Richardson Teel, as Trustee of the
Susanne Richardson Teel Trust; Walter and
Beverly Lydick dba Lydick Family Farms, LLC;
Nancy Kirkholm dba Grainbelt Farms, LLC; Mike
Storm dba Omaha Nation Farms, LLC; Nick
Storm dba Storm Farms, LLC; Timothy Gilmore;
William Douglas Gilmore; Wendell and Virginia
Hinkle, Trustees of the Wendell and Virginia
Hinkle Living Trust; Dennis Connealy; Quentin
and Jill Connealy; Theodore Connealy; David and
Elizabeth Brainard; Ralph Phelps, Trustee of the
Ralph L. Phelps and Janice K. Phelps Trust; Phil
Peters; George R. Ruwwe, Trustee of the George
R. Ruwwe Revocable Living Trust; Scott
McCann, individually and dba Lakeshore Grill,
LLC; Tom Cady; Rickey Barnes; John Walton
dba J&C Walton Investments, Ltd.; Greg Rother;
Brian and Florence Stevenson; Harbor 671
Association; David Anderson; Bradley Kurtz dba
KZ Farms, Inc.; Kent Jackson; Scott Rouse,
Trustee of the Scott Rouse Trust; Curtis W. Clark,
Trustee of the Clark Family Trust; Gary and
Shirley Keck; Dennis and Linda Jordan; William
Ewing dba EBIZ, Inc. dba Whiskey Rebellion; Joe
and Gail Cluck; Willis Armbrust; Larry and Kay
McKinzie; Larry McKinzie, Trustee of the Irvin
Bence Trust; Bradley Verzani; David and Beth
Harding; Kenneth W. Reeder; Dennis and Beth
Saunders; Gary Wayne Jackson; Vonna Jean
Johnson; Loren L. Chapin and John L. Chapin;
Loren L. and Rosamond Chapin; Loren Chapin,
Trustee of the L.D. Chapin Estate, LLC; John and
Gloria Weiss, Trustees of the John G. and Gloria
C. Weiss Trust; Peter and Joyce Grotzinger; Larry
and Betty Moyer; Joyce Graybill; Lawrence and
Marilyn Wirth; David Jones; Big Lake
Improvement Association, Inc.; Galen and Jody
Curtis; Cameron and Sharon Pope; Harvey
Palmer; Robert Corio; John and Judy Forsen;
Scott Phipps; Scott Navinskey; J.D. Euler, Trustee
of the J.D. Euler and Margaret Euler Joint Trust;
Paul and Rebecca Derks; Michael and Rosemary

Wheeler; Richard Poland, Trustee of the Richard
N. Poland Revocable Living Trust; Bryce and
Jamie Poland; Harry and Lenna Fredericksen;
Gregory Albert Smith; Jeffrey Stephen Longval;
Steven Svoboda; Judy Stephens; Ray and Sondra
Sorensen; Richard L. Schepler, Jr.; John and
Shirley Taylor; Jim and Diana Harris; Charles and
Patti Bohlen dba Bohlen's Farm Service, Inc.;
Dennis Carlson dba Tob-Isle, Inc.; Lloyd and
Marsella Christmas; William Dailey; Brent Hayes;
Blake Himmelwright dba JLM Farms & River
Partners, LLC; Larry and Donette Jackson dba
Blodgett Farms, LLC; Mark Jones dba Lazy J
Farms, Inc.; Rodney McElroy; Van Newell dba
Newell River Farms, Inc.; Gary Olson dba Gary
E. Olson Farms, Inc.; Jon Olson dba Jon C. Olson
Farms, Inc.; Steve Olson dba Steve Olson Farms,
Inc.; Bret Pettit dba Pettit Farms, Inc.; Tim
Stewart; Paul Wenninghoff dba Wenninghoff
Enterprises, LLC; Roger and Grace Wipf; Duane
Johnson; Dan Lederman; James and Sharon
Forney; Tracy Barnes; Franklin and Cheryl Salter;
Jason Salter; Gloria Breckenridge; Randy L. and
Patricia Olson:

       Plaintiffs,

  v.

UNITED STATES OF AMERICA,

       Defendant.

## COMPLAINT

### NATURE OF THE CLAIM

1.    Plaintiffs bring their claims for a taking of their land and other property without

just compensation, by means of a significant and deliberate departure by the U.S. Army Corps of

Engineers ("the Corps" or "Corps") from its decades-old policies and practices regarding the

management of the Missouri River ("the River"), including its management of the Missouri River Mainstem Reservoir System ("the System") and the Missouri River Bank Stabilization and Navigation Project ("BSNP").  Specifically, in order to restore habitat of certain native species in the Missouri River Basin ("the Basin"), the Corps departed from its longstanding management policies and practices when it knew that the direct, natural, probable, and foreseeable result of that departure would be increasingly frequent and severe flooding of Plaintiffs' land and property.

2.	The Corps foresaw that its departure from its longstanding policies and practices would result in a severe invasion of Plaintiffs' property, appropriating Plaintiffs' rights therein, by effectively imposing flowage easements on Plaintiffs' property.

3.	As a direct, natural, probable, and foreseeable result of the Corps' departure from its flood control policies and procedures, Plaintiffs' land has been subjected to flooding during 5 of the last 7 years.  These floods have been atypical; recurring; and of unprecedented severity, duration, and location.  These floods have substantially impacted and destroyed Plaintiffs' land and property, depriving them of its use and enjoyment for extended periods of time and, in some cases, permanently.

4.	But for the Corps' departure from its longstanding flood control policies and procedures, most if not all of this flooding would not have occurred at all.  To the extent that any flooding would have occurred under the Corps' prior policies and practices, it would have been de minimus.

5.	The Corps' departure from its policies and procedures was part of a multi-year plan whose purpose was to appropriate a benefit for the public, namely, to protect at-risk or

endangered fish and wildlife, to restore fish and wildlife habitat purportedly lost as a result of the Corps' prior flood-control projects, and to preserve wetlands in the Basin.

6. The Corps foresaw that its departure from the status quo ante would result in frequent overflow of the River and devaluing of Plaintiffs' private property, sacrificing Plaintiffs' land and other property for that public purpose, and made public statements to that effect.

7. The flooding caused by the Corps' changed policies and practices imposed a severe burden on Plaintiffs' land and other property, profoundly disrupting and interfering with Plaintiffs' reasonable, investment-backed expectations regarding the intended and customary use of that land and other property.

8. Historically, the federal government had expressly encouraged and incentivized farming and economic development in the Basin, *inter alia*, by undertaking and committing to provide flood control. The instant Plaintiffs reasonably relied on the Corps' decades-old policies and practices in managing the River, which prioritized flood control, and collectively invested billions of dollars and tremendous efforts in establishing and maintaining their land and other property for its intended and customary use.

9. The Corps has not obtained flowage easements, through contract or inverse condemnation. Neither has the Corps offered Plaintiffs just compensation for the benefit that it has appropriated for public use. Nonetheless, the Corps has explained to farmers living along the River that, in order to restore fish and wildlife, "everyone would have to do their part," and that "[y]our part is to move out of the floodplain and don't live there."

10.     The Corps' policies and practices have sacrificed Plaintiffs' land and other property, without compensation, for the public benefit.

## JURISDICTION AND VENUE

11.     This Complaint states causes of action for taking of property and flowage easements without just compensation in violation of the Fifth Amendment to the United States Constitution.  The Court has jurisdiction over this action under 28 U.S.C. § 1491(a).

12.     Venue is proper in the United States Court of Federal Claims pursuant to 28 U.S.C. § 1491(a).

## PARTIES

### Plaintiffs

13.     The Plaintiffs are farmers who own and/or operate farms in the Basin; individuals who reside and/or operate businesses in the Basin; or corporations, partnerships, trusts, or other legal entities that own and/or operate businesses in the Basin.

14.     The Plaintiffs were farmers who own and/or operate farms in the Basin; individuals who reside and/or operate businesses in the Basin; or corporations, partnerships, trusts, or other legal entities that own and/or operate businesses in the Basin.

15.     Plaintiff Ideker Farms, Inc., was deprived of the use and enjoyment of its land in Holt County, Missouri, due to a taking by flooding in 2007, 2008, 2010, 2011 and 2013.

16.     Plaintiffs Lynn and Elaine Binder, Todd and April Binder, and Tyler and Valerie Binder were deprived of the use and enjoyment of their land in Atchison and Holt Counties, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2011.

17.     Plaintiffs Richard Binder, Dustin Binder and Darwin Binder, dba Midwest Grain Co., were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

18.     Plaintiffs Eddie Drewes, Robert W. Drewes Recoverable Trust, Rita K. Drewes Recoverable Trust and David Drewes, individually and dba Drewes Farms, Inc., were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2011.

19.     Plaintiff Patrick Newlon, dba Newlon Farms, Inc., was deprived of the use and enjoyment of his land in Fremont County, Iowa, due to a taking by flooding in 2008, 2010 and 2011.

20.     Plaintiff David Newlon, dba D Double N Farms, Inc., was deprived of the use and enjoyment of his land in Fremont County, Iowa, due to a taking by flooding in 2008, 2010 and 2011.

21.     Plaintiffs Jason Taylor and Brad Taylor, dba H.B.J. Farms, Inc., were deprived of the use and enjoyment of their land in Doniphan County, Kansas, and Richardson County, Nebraska, due to a taking by flooding in 2007, 2008, 2010 and 2011.

22.     Plaintiff Lyle Hodde, dba Hodde & Sons Limited Partnership, was deprived of the use and enjoyment of his land in Fremont County, Iowa, and Atchison County, Missouri, due to a taking by flooding in 2007, 2008, 2010, 2011 and 2013.

23.     Plaintiff Gerald Schneider, dba Buffalo Hollow Farms, Inc., was deprived of the use and enjoyment of his land in Doniphan County, Kansas, due to a taking by flooding in 2007, 2008, 2010, 2011 and 2013.

24.     Plaintiff Steve Cunningham, Trustee of the Doris I. Cunningham and Steven K. Cunningham Declarations of Trust, was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2011.

25.     Plaintiff Gail Cunningham, dba Cunningham Farms, Inc., was deprived of the use and enjoyment of her land in Holt County, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2011.

26.     Plaintiffs Charles and Connie Garst, individually and dba Garst Farms, Inc., were deprived of the use and enjoyment of their land in Atchison County, Missouri, due to a taking by flooding in 2008, 2010 and 2011.

27.     Plaintiffs Ron and Mary Schneider, were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2010, 2011 and 2013.

28.     Plaintiffs Scott and Susan Olson were deprived of the use and enjoyment of their land in Burt County, Nebraska, due to a taking by flooding in 2011.

29.     Plaintiffs Tevan Markt and Tom Markt, dba T&T Farms, Inc., were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2011.

30.     Plaintiff Leo Ettleman was deprived of the use and enjoyment of his land in Fremont County, Iowa, due to a taking by flooding in 2011.

31.     Plaintiffs David and Kimberly Sieck were deprived of the use and enjoyment of their land in Mills County, Iowa, due to a taking by flooding in 2011.

32.     Plaintiffs Arthur and Diane Sieck were deprived of the use and enjoyment of their land in Pottawattamie County, Iowa, due to a taking by flooding in 2011.

33.     Plaintiff Aaron Luce, dba Aaron Luce Farm Company, was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

34.     Plaintiff Bryce Andersen, dba Andersen Family Farms; Midwest Investments, LLC; Andersen Farms, Inc., and Engra Andersen, were deprived of the use and enjoyment of their land in Dakota County, Nebraska, due to a taking by flooding in 2011.

35.     Plaintiff Brett Derr, dba Lyle Derr Farm Co., was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2013.

36.     Plaintiff Brandon Roup, dba Roup Farms, LLC, was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

37.     Plaintiffs William and Sharon Sheldon, individually and dba Sheldon-Frederick, LLC, were deprived of the use and enjoyment of their land in Fremont County, Iowa, due to a taking by flooding in 2011.

38.     Plaintiffs Patrick and Angela Sheldon, were deprived of the use and enjoyment of their land in Fremont County, Iowa, due to a taking by flooding in 2011.

39.     Plaintiff James Group, dba Triple G Farms Partnership, was deprived of the use and enjoyment of his land in Cass County, Nebraska, and Mills and Fremont Counties, Iowa, due to a taking by flooding in 2008, 2010 and 2011.

40.     Plaintiffs Philip and Charla Graves, were deprived of the use and enjoyment of their land in Holt and Atchison Counties, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2011.

41.     Plaintiff Harry Larson, dba L&H Investments, Inc., was deprived of the use and enjoyment of his land in Nemaha County, Nebraska, due to a taking by flooding in 2008, 2010 and 2011.

42.     Plaintiff Rickey Gillenwater, dba Young Farms, Inc., was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

43.     Plaintiff Dennis Erickson, dba Erickson Farms, Inc., was deprived of the use and enjoyment of his land in Atchison County, Missouri, due to a taking by flooding in 2011.

44.     Plaintiff Wayne Johnson, Trustee of the Robert Stoxen Trust, was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

45.     Plaintiff Mark Poulosky was deprived of the use and enjoyment of his land in Dixon County, Nebraska, due to a taking by flooding in 2011.

46.     Plaintiffs Bruce and Leisa Biermann, Trustees of the Biermann Living Trust, were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2011.

47.     Plaintiff Leslie Albrecht, dba L&E Farms General Partnership, was deprived of the use and enjoyment of her land in Dakota County, Nebraska, due to a taking by flooding in 2011.

48.     Plaintiffs Dennis and Betty Reagan, were deprived of the use and enjoyment of their land in Platte County, Missouri, due to a taking by flooding in 2008 and 2011.

49.     Plaintiffs Shane and Billie Reagan were deprived of the use and enjoyment of their land in Buchanan and Platte Counties, Missouri, due to a taking by flooding 2008 and 2011.

50.    Plaintiff Dennis Hendrickson, Trustee of the Dennis and Patricia Hendrickson Family Trust, was deprived of the use and enjoyment of his land in Atchison County, Missouri, due to a taking by flooding in 2011.

51.    Plaintiff Darin Hendrickson was deprived of the use and enjoyment of his land in Fremont County, Iowa, due to a taking by flooding in 2011.

52.    Plaintiff Douglas Johnson, dba Johnson Ag, Inc. and Johnson Farms, Inc., was deprived of the use and enjoyment of his land in Doniphan County, Kansas, due to a taking by flooding in 2007, 2008, 2010, 2011 and 2013.

53.    Plaintiffs Douglas Johnson, Craig Johnson and David Johnson, dba DCD Farms, were deprived of the use and enjoyment of their land in Doniphan County, Kansas, due to a taking by flooding in 2007 and 2008.

54.    Plaintiffs Brian and Kelly Johnson, dba KMJ Farms, Inc., were deprived of the use and enjoyment of their land in Fremont County, Iowa, due to a taking by flooding in 2007, 2011 and 2013.

55.    Plaintiffs Richard Lee, Richard Lee, Jr. and Janice Lee Bucman, were deprived of the use and enjoyment of their land in Buchanan and Platte Counties, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2011.

56.    Plaintiffs Edward and Diane Foral were deprived of the use and enjoyment of their land in Atchison and Holt Counties, Missouri, due to a taking by flooding in 2011 and 2013.

57.    Plaintiff John Tyson, dba Tyson's Inc., was deprived of the use and enjoyment of his land in Washington County, Nebraska, due to a taking by flooding in 2010 and 2011.

58.     Plaintiff James Gerking, dba Entire Recycling, Inc., was deprived of the use and enjoyment of his land in Atchison County, Missouri, due to a taking by flooding in 2011.

59.     Plaintiff John D. Whetstine was deprived of the use and enjoyment of his land in Doniphan County, Kansas, due to a taking by flooding in 2010 and 2011.

60.     Plaintiffs John R. and Virginia Whetstine, individually and dba Whetstine Farms, Inc., were deprived of the use and enjoyment of their land in Doniphan County, Kansas, due to a taking by flooding in 2007, 2008, 2010 and 2011.

61.     Plaintiffs Gary Schemmel and Robert Schemmel, were deprived of the use and enjoyment of their land in Fremont County, Iowa, and Nemaha County, Nebraska, due to a taking by flooding in 2008, 2010, 2011 and 2013.

62.     Plaintiff Lance Schuler, Trustee of the Joan Schuler Revocable Trust, was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2010 and 2011.

63.     Plaintiffs Lanny and Ramona Frakes were deprived of the use and enjoyment of their land in Buchanan and Platte Counties, Missouri, due to a taking by flooding in 2008, 2010 and 2011.

64.     Plaintiff L. Bret Broderson, dba Broderson Farms, Inc., was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2011.

65.     Plaintiff Kevin Brummond was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2011.

66.     Plaintiff Stanley Griffin, dba Griffin Farms Partnership, was deprived of the use and enjoyment of his land in Atchison County, Missouri, due to a taking by flooding in 2008, 2010 and 2011.

67.     Plaintiff Richard Archer was deprived of the use and enjoyment of his land in Monona County, Iowa, due to a taking by flooding in 2011.

68.     Plaintiff Paul Dailey was deprived of the use and enjoyment of his land in Union County, South Dakota, due to a taking by flooding in 2011.

69.     Plaintiffs Robert Olson and Mike Olson were deprived of the use and enjoyment of their land Harrison Burt County, Nebraska, due to a taking by flooding in 2011.

70.     Plaintiff Steve Marlatt, dba Marlatt Brothers, LLC, was deprived of the use and enjoyment of his land in Buchanan County, Missouri due to a taking by flooding in 2007, 2008, 2010 and 2011.

71.     Plaintiff Thomas Marlatt, dba Marlatt Farms, LLC, was deprived of the use and enjoyment of his land in Buchanan County, Missouri, due to a taking by flooding in 2011.

72.     Plaintiff Golden Triangle Energy, LLC, was deprived of the use and enjoyment of its land in Holt County, Missouri, due to a taking by flooding in 2011.

73.     Plaintiffs Jeff and Melinda Holstine were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2011.

74.     Plaintiffs Dale and Marcina Holstine were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2011.

75.     Plaintiff Lynn Handy, dba Handy Farms, Inc., was deprived of the use and enjoyment of her land in Fremont County, Iowa, due to a taking by flooding in 2011.

76.     Plaintiff James Olson, dba James L. Olson Farms, Inc., was deprived of the use and enjoyment of his land in Monona and Woodbury Counties, Iowa, due to a taking by flooding in 2011.

77.     Plaintiff Mike Lyons, dba Lyons Enterprises, Inc. and K&M Lyons, Inc., was deprived of the use and enjoyment of his land in Fremont County, Iowa, due to a taking by flooding in 2011.

78.     Plaintiff Doug Lyons, dba Lyons Farms, Inc., was deprived of the use and enjoyment of his land in Fremont County, Iowa, due to a taking by flooding in 2011.

79.     Plaintiffs Neale and Laura Shaner, individually and dba Shaner Family Farm, Ltd., were deprived of the use and enjoyment of their land in Washington County, Nebraska, due to a taking by flooding in 2011.

80.     Plaintiff Neale Shaner, Trustee of the G. Neale Shaner Titleholder Trust, was deprived of the use and enjoyment of his land in Washington County, Nebraska, due to a taking by flooding in 2011.

81.     Plaintiff Jeff Shaner, dba Neale Farms, Inc. and C.E.M. Shaner Farms, LLC, was deprived of the use and enjoyment of his land in Washington County, Nebraska, due to a taking by flooding in 2011.

82.     Plaintiff Gerhardt Thompson, dba T&T Trucking, Inc., was deprived of the use and enjoyment of his land in Washington County, Nebraska, due to a taking by flooding in 2011.

83.     Plaintiffs Randy and Sharon Thompson were deprived of the use and enjoyment of their land in Washington County, Nebraska, due to a taking by flooding in 2011.

84.     Plaintiff Daniel Rohde was deprived of the use and enjoyment of his land in Dakota County, Nebraska, and Monona and Woodbury Counties, Iowa, due to a taking by flooding in 2011.

85.     Plaintiff Timothy Gregerson, dba G&G Bottom Farms, LLC, was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2007, 2008, 2010, 2011 and 2013.

86.     Plaintiff Emanuel Weber, dba Weber Farms, Inc., was deprived of the use and enjoyment of his land in Doniphan County, Kansas, due to a taking by flooding in 2007, 2008, 2010, 2011 and 2013.

87.     Plaintiffs John and Edna Burch, dba NotByLuck, LLC, were deprived of the use and enjoyment of their land in Atchison County, Missouri, due to a taking by flooding in 2011.

88.     Plaintiff Glenn Payne was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2011.

89.     Plaintiff Delores Payne, dba DK Payne Investments, Ltd., was deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

90.     Plaintiffs Rodney and Jill Finnell, dba R&J Finnell Farms, LLC, were deprived of the use and enjoyment of their land in Fremont County, Iowa, due to a taking by flooding in 2011.

91.     Plaintiffs Rick and Rebecca Jones were deprived of the use and enjoyment of their land in Nemaha County, Nebraska, due to a taking by flooding in 2007, 2008, 2010, 2011 and 2013.

92.     Plaintiffs Warren and Peggy Jones were deprived of the use and enjoyment of their land in Nemaha County, Nebraska, due to a taking by flooding 2007, 2008, 2010, 2011 and 2013.

93.     Plaintiff Brit Liljedahl, dba Sabel Farms, Inc., was deprived of the use and enjoyment of his land in Harrison and Pottawattamie Counties, Iowa, and Washington County, Nebraska, due to a taking by flooding in 2010, 2011 and 2013.

94.     Plaintiffs Kenneth Munsterman and Bobby Munsterman, dba Munsterman Brothers, were deprived of the use and enjoyment of their land in Platte County, Missouri, due to a taking by flooding in 2007 and 2011.

95.     Plaintiff Evan Copsey, dba Copsey Farms, was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

96.     Plaintiff David Meyerkorth was deprived of the use and enjoyment of his land in Atchison County, Missouri, due to a taking by flooding in 2011.

97.     Plaintiff Doug Shirley, dba Triangle Enterprises, Inc., was deprived of the use and enjoyment of his land in Fremont County, Iowa, due to a taking by flooding in 2008, 2010 and 2011.

98.     Plaintiffs Duane and Jolee Craig were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

99.     Plaintiff Mike Foley was deprived of the use and enjoyment of his land in Doniphan County, Kansas, due to a taking by flooding in 2007, 2008, 2010 and 2011.

100.     Plaintiff A. Douglas Kwikkel, dba Royal Rock Investments, LLC, was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2010 and 2011.

101.     Plaintiff Larry Elliott was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2011.

102.     Plaintiff Timothy Lee was deprived of the use and enjoyment of his land in Platte County, Missouri, due to a taking by flooding in 2007, 2008 and 2011.

103.     Plaintiff Marvin Green, Trustee of the Alma Green Trust, was deprived of the use and enjoyment of his land in Doniphan County, Kansas, due to a taking by flooding in 2008, 2010, 2011 and 2013.

104.     Plaintiff Susanne Richardson Teel, Trustee of the Susanne Richardson Teel Trust, was deprived of the use and enjoyment of her land in Holt County, Missouri, due to a taking by flooding in 2011.

105.     Plaintiffs Walter and Beverly Lydick, dba Lydick Family Farms, LLC, were deprived of the use and enjoyment of their land in Burt County, Nebraska, due to a taking by flooding in 2011.

106.     Plaintiff Nancy Kirkholm, dba Grainbelt Farms, LLC, was deprived of the use and enjoyment of her land in Dakota County, Nebraska, due to a taking by flooding in 2011.

107.     Plaintiff Mike Storm, dba Omaha Nation Farms, LLC, was deprived of the use and enjoyment of his land in Thurston County, Nebraska, due to a taking by flooding in 2011.

108.     Plaintiff Nick Storm, dba Storm Farms, LLC, was deprived of the use and enjoyment of his land in Dakota County, Nebraska, due to a taking by flooding in 2011.

109.    Plaintiff Timothy Gilmore was deprived of the use and enjoyment of his land in Doniphan County, Kansas, due to a taking by flooding in 2007, 2008, 2010 and 2011.

110.    Plaintiff William Douglas Gilmore was deprived of the use and enjoyment of his land in Doniphan County, Kansas, due to a taking by flooding in 2007, 2008, 2010 and 2011.

111.    Plaintiffs Wendell and Virginia Hinkle, Trustees of the Wendell and Virginia Hinkle Living Trust, were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2010, 2011 and 2013.

112.    Plaintiff Dennis Connealy was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2011.

113.    Plaintiffs Quentin and Jill Connealy, were deprived of the use and enjoyment of their land in Burt County, Nebraska, due to a taking by flooding in 2011.

114.    Plaintiff Theodore Connealy was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2011.

115.    Plaintiffs David and Elizabeth Brainard were deprived of the use and enjoyment of their land in Burt County, Nebraska, due to a taking by flooding in 2011.

116.    Plaintiff Ralph Phelps, Trustee of the Ralph L. Phelps and Janice K. Phelps Trust, was deprived of the use and enjoyment of his land in Atchison County, Missouri, due to a taking by flooding in 2011.

117.    Plaintiff Phil Peters was deprived of the use and enjoyment of his land in Fremont County, Iowa, due to a taking by flooding in 2008, 2010 and 2011.

118.     Plaintiff George R. Ruwwe, Trustee of the George R. Ruwwe Revocable Living Trust, was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

119.     Plaintiff Scott McCann, individually and dba Lakeshore Grill, LLC, was deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

120.     Plaintiff Tom Cady was deprived of the use and enjoyment of his land in Washington County, Nebraska, due to a taking by flooding in 2011.

121.     Plaintiff Rickey Barnes was deprived of the use and enjoyment of his land in Atchison and Holt Counties, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

122.     Plaintiff John Walton, dba J&C Walton Investments, Ltd., was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

123.     Plaintiff Greg Rother was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

124.     Plaintiffs Brian and Florence Stevenson were deprived of the use and enjoyment of their land in Burt County, Nebraska, due to a taking by flooding in 2011.

125.     Plaintiff Harbor 671 Association was deprived of the use and enjoyment of its land in Burt County, Nebraska, due to a taking by flooding in 2011.

126.     Plaintiff David Anderson was deprived of the use and enjoyment of his land in Harrison and Monona Counties, Iowa, due to a taking by flooding in 2011.

127.    Plaintiff Bradley Kurtz, dba KZ Farms, Inc., was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2008, 2010 and 2011.

128.    Plaintiff Kent Jackson was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2011.

129.    Plaintiff Scott Rouse, Trustee of the Scott Rouse Trust, was deprived of the use and enjoyment of his land in Andrew County, Missouri, due to a taking by flooding in 2010 and 2011.

130.    Plaintiff Curtis W. Clark, Trustee of the Clark Family Trust, was deprived of the use and enjoyment of his land in Doniphan County, Kansas, due to a taking by flooding in 2007, 2008, 2010 and 2011.

131.    Plaintiffs Gary and Shirley Keck were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

132.    Plaintiffs Dennis and Linda Jordan were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

133.    Plaintiff William Ewing, dba EBIZ, Inc. and Whiskey Rebellion, was deprived of the use and enjoyment of his land in Buchanan County, Missouri, due to a taking by flooding in 2011.

134.    Plaintiffs Joe and Gail Cluck were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2011.

135.    Plaintiff Willis Armbrust was deprived of the use and enjoyment of his land in Washington County, Nebraska, due to a taking by flooding in 2011.

136.    Plaintiff Larry and Kay McKinzie were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2008 and 2011.

137.    Plaintiff Larry McKinzie, Trustee of the Irvin Bence Trust, was deprived of the use and enjoyment of his land in Atchison County, Missouri, due to a taking by flooding in 2008 and 2011.

138.    Plaintiff Bradley Verzani was deprived of the use and enjoyment of his land in Dixon County, Nebraska, due to a taking by flooding in 2011.

139.    Plaintiffs David and Beth Harding were deprived of the use and enjoyment of their land in Burt County, Nebraska, due to a taking by flooding in 2011.

140.    Plaintiff Kenneth W. Reeder was deprived of the use and enjoyment of his land in Buchanan County, Missouri, due to a taking by flooding in 2011.

141.    Plaintiffs Dennis and Beth Saunders were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

142.    Plaintiff Gary Wayne Jackson was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

143.    Plaintiff Vonna Jean Johnson was deprived of the use and enjoyment of her land in Burt County, Nebraska, due to a taking by flooding in 2011.

144.    Plaintiffs Loren L. Chapin and John L. Chapin were deprived of the use and enjoyment of their land in Platte County, Missouri, due to a taking by flooding in 2010 and 2011.

145.    Plaintiffs Loren L. and Rosamond A. Chapin were deprived of the use and enjoyment of their land in Platte County, Missouri, due to a taking by flooding in 2011.

146.    Plaintiff Loren Chapin, Trustee of the L.D. Chapin Estate, LLC, was deprived of the use and enjoyment of her land in Platte County, Missouri, due to a taking by flooding in 2008 and 2011.

147.    Plaintiffs John and Gloria Weiss, Trustees of the John G. and Gloria C. Weiss Trust, were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2011.

148.    Plaintiffs Peter and Joyce Grotzinger were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

149.    Plaintiffs Larry and Betty Moyer were deprived of the use and enjoyment of their land in Fremont County, Iowa, due to a taking by flooding in 2011.

150.    Plaintiff Joyce Graybill was deprived of the use and enjoyment of her land in Washington County, Nebraska, due to a taking by flooding in 2011.

151.    Plaintiffs Lawrence and Marilyn Wirth were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

152.    Plaintiff David Jones was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2011.

153.    Plaintiff Big Lake Improvement Association, Inc., was deprived of the use and enjoyment of his land in Holt County, Missouri due to a taking by flooding in 2011.

154.    Plaintiffs Galen and Jody Curtis were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2007, 2010 and 2011.

155.    Plaintiffs Cameron and Sharon Pope were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2011.

156.    Plaintiff Harvey Palmer was deprived of the use and enjoyment of his land in Sarpy County, Nebraska, due to a taking by flooding in 2011.

157.    Plaintiff Robert Corio was deprived of the use and enjoyment of his land in Union County, South Dakota, due to a taking by flooding in 2011.

158.    Plaintiffs John and Judy Forsen were deprived of the use and enjoyment of their land in Washington County, Nebraska, due to a taking by flooding in 2011.

159.    Plaintiff Scott Phipps was deprived of the use and enjoyment of his land in Harrison County, Iowa, due to a taking by flooding in 2011.

160.    Plaintiff Scott Navinskey was deprived of the use and enjoyment of his land in Platte County, Missouri, due to a taking by flooding in 2010 and 2011.

161.    Plaintiff J.D. Euler, Trustee of the J.D. Euler and Margaret Euler Joint Trust, was deprived of the use and enjoyment of his land in Doniphan County, Kansas, due to a taking by flooding in 2011.

162.    Plaintiffs Paul and Rebecca Derks were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

163.    Plaintiffs Michael and Rosemary Wheeler were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

164.    Plaintiff Richard Poland, Trustee of the Richard N. Poland Revocable Living Trust, was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

165.    Plaintiffs Bryce and Jamie Poland were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2011.

166.     Plaintiffs Harry and Lenna Fredericksen were deprived of the use and enjoyment of their land in Fremont County, Iowa, due to a taking by flooding in 2011.

167.     Plaintiff Gregory Albert Smith was deprived of the use and enjoyment of his land in Atchison County, Kansas, due to a taking by flooding in 2011.

168.     Plaintiff Jeffrey Stephen Longval was deprived of the use and enjoyment of his land in Woodbury County, Iowa, due to a taking by flooding in 2011.

169.     Plaintiff Steven Svoboda was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

170.     Plaintiff Judy Stephens was deprived of the use and enjoyment of her land in Pottawattamie County, Iowa, due to a taking by flooding in 2011.

171.     Plaintiffs Ray and Sandra Sorensen were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

172.     Plaintiff Richard L. Schepler, Jr., was deprived of the use and enjoyment of his land in Fremont County, Iowa, due to a taking by flooding in 2011.

173.     Plaintiffs John and Shirley Taylor were deprived of the use and enjoyment of their land in Doniphan County, Kansas, and Holt County, Missouri, due to a taking by flooding in 2007, 2008, 2010 and 2011.

174.     Plaintiffs Jim and Diana Harris were deprived of the use and enjoyment of their land in Fremont County, Iowa, due to a taking by flooding in 2011.

175.     Plaintiffs Charles and Patti Bohlen, dba Bohlen's Farm Service, Inc., were deprived of the use and enjoyment of their land in Fremont County, Iowa, due to a taking by flooding in 2011.

176.     Plaintiff Dennis Carlson, dba Tob-Isle, Inc., was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2011.

177.     Plaintiffs Lloyd and Marsella Christmas were deprived of the use and enjoyment of their land in Holt County, Missouri, due to a taking by flooding in 2011.

178.     Plaintiff William Dailey was deprived of the use and enjoyment of his land in Union County, South Dakota, due to a taking by flooding in 2011.

179.     Plaintiff Brent Hayes was deprived of the use and enjoyment of his land in Woodbury County, Iowa, due to a taking by flooding in 2011.

180.     Plaintiff Blake Himmelwright, dba JLM Farms & River Partners, LLC, was deprived of the use and enjoyment of his land in Pratt County, Kansas, due to a taking by flooding in 2011.

181.     Plaintiffs Larry and Donette Jackson, dba Blodgett Farms, LLC, were deprived of the use and enjoyment of their land in Burt County, Nebraska, due to a taking by flooding in 2011.

182.     Plaintiff Mark Jones, dba Lazy J Farms, Inc., was deprived of the use and enjoyment of his land in Richardson County, Nebraska, due to a taking by flooding in 2011.

183.     Plaintiff Rodney McElroy was deprived of the use and enjoyment of his land in Fremont County, Iowa, due to a taking by flooding in 2011.

184.     Plaintiff Van Newell, dba Newell River Farms, Inc., was deprived of the use and enjoyment of his land in Burt County, Nebraska, due to a taking by flooding in 2011.

185.     Plaintiff Gary Olson, dba Gary E. Olson Farms, Inc., was deprived of the use and enjoyment of his land in Dakota County, Nebraska, due to a taking by flooding in 2011.

186.    Plaintiff Jon Olson, dba Jon C. Olson Farms, Inc., was deprived of the use and enjoyment of his land in Dakota County, Nebraska, due to a taking by flooding in 2011.

187.    Plaintiff Steve Olson, dba Steve Olson Farms, Inc., was deprived of the use and enjoyment of his land in Dakota County, Nebraska, due to a taking by flooding in 2011.

188.    Plaintiff Bret Pettit, dba Pettit Farms, Inc., was deprived of the use and enjoyment of his land in Sarpy County, Nebraska, due to a taking by flooding in 2011.

189.    Plaintiff Tim Stewart was deprived of the use and enjoyment of his land in Dakota County, Nebraska, due to a taking by flooding in 2011.

190.    Plaintiff Paul Wenninghoff, dba Wenninghoff Enterprises, LLC, was deprived of the use and enjoyment of his land in Sarpy County, Nebraska, due to a taking by flooding in 2011.

191.    Plaintiffs Roger and Grace Wipf were deprived of the use and enjoyment of their land in Burt County, Nebraska, due to a taking by flooding in 2011.

192.    Plaintiff Duane Johnson, dba Johnson Acres, was deprived of the use and enjoyment of his land in Holt County, Missouri, due to a taking by flooding in 2010 and 2011.

193.    Plaintiff Dan Lederman was deprived of the use and enjoyment of his land in Union County, South Dakota, due to a taking by flooding in 2011.

194.    Plaintiffs James and Sharon Forney were deprived of the use and enjoyment of their land in Stanley County, South Dakota, due to a taking by flooding in 2011.

195.    Plaintiff Tracy Barnes was deprived of the use and enjoyment of her land in Atchison County, Missouri, due to a taking by flooding in 2011.

196.     Plaintiffs Franklin and Cheryl Salter were deprived of the use and enjoyment of their land in Harrison County, Iowa, due to a taking by flooding in 2011.

197.     Plaintiff Jason Salter was deprived of the use and enjoyment of his land in Harrison County, Iowa, due to a taking by flooding in 2011.

198.     Plaintiff Gloria Breckenridge was deprived of the use and enjoyment of her land in Burt County, Nebraska, due to a taking by flooding in 2011.

199.     Plaintiffs Randy L. and Patricia Olson were deprived of the use and enjoyment of their land in Burt County, Nebraska, due to a taking by flooding in 2011.

**Defendant**

200.     The Defendant is the United States of America.

## HISTORICAL BACKGROUND

**The Federal Government Undertook Flood Control to Induce People to Settle in the Basin and Invest in Farms and Other Businesses There, Promoting Economic Development**

201.     In early history, the River was prone to frequent flooding on a bi-annual basis, resulting in the creation and maintenance of riverine and floodplain habitats in cycles of erosion and deposition that continuously reshaped the channel and the floodplain.

202.     To protect their land and property from destruction during such floods, early settlers and residents in the early 20th century who lived along the River made the limited efforts that they could to contain flooding of the River.

203.     Under the Swamp Land Act of 1850, the federal government granted twelve states, including Missouri and Iowa, millions of acres of swamp and overflow lands for the purpose of reclaiming land for agricultural and other commercial development through

construction of levies and drains.  In the case of Missouri, after the land was granted to the state, the state subsequently sold portions of it to its citizens.

204.    Migrants worked tirelessly to drain millions of square acres of swampland by the 1920s to farm cotton and other crops.    To further consolidate their private efforts, landowners successfully petitioned county courts to form state-law authorized levee and drainage districts to tax themselves through benefit assessments, determined per acre every year, to raise necessary funds for building levees and drainage systems along the river.

205.    Until it passed the 1917 Flood Control Act, Congress considered flood control exclusively a local responsibility across the country.  The federal government's involvement in flood control was motivated, in part, by concerns that local dam and levee projects might interfere with federal navigation priorities and that federal involvement could better avoid conflicting state priorities for flood control.

206.    In 1929, the Corps turned its attention to flood control on the Missouri River and began comprehensive studies of the principal river basins in the watershed.  Beginning in the 1930s, the federal government began constructing dams along the main stem of the River. Construction of the first dam, the Fort Peck Dam, commenced in 1933. Subsequent authorization by Congress in 1935 clarified that the purposes of construction were to provide flood control and enhance navigation.

207.    Congress authorized even wider federal authority over flood control in the Flood Control Act of 1936, which declared floods a federal responsibility and established a national flood-control policy.

208.   Following a major flood of the River in 1943, the Corps prepared a report to Congress proposing, *inter alia*, five additional major dams on the mainstream of the River. Congress determined that it would be impossible to increase investment in and development of the Basin for agricultural, commercial, and industrial purposes to the extent it desired without the federal government undertaking large-scale flood-control projects to provide consistent and reliable protection from flooding.

209.   With the Flood Control Act of 1944 ("FCA"), Congress authorized what became known as the "Pick-Sloan Plan." The Pick-Sloan Plan involved construction of a series of dams, reservoirs, and levees along the River. It later authorized the BSNP to further aid in achieving those goals.

210.   The Pick-Sloan Plan was the product both of the Great Depression and the progressive conservation movement's belief that multiple-purpose water projects would stimulate growth in the arid West. The gospel of the progressive movement was that growth would follow the "harnessing"of rivers.

211.   A key purpose of the Pick-Sloan Plan was to control flooding in the Basin in order to increase the population in the same and to induce individuals to invest in agriculture and other forms of economic development there.

212.   The Pick-Sloan Plan was conceived of as a joint venture between the government and private citizens. The government, recognizing that the unpredictable but frequent and widespread flooding of the River would forever limit private parties' willingness to invest in the Basin, determined to tame the River. The government's stated goal was to create a navigable river channel with habitable and profitable land in the Basin. Should they do this, through flood

control and other measures, the government determined that private parties would be more enticed to settle in and invest capital in the area, leading to widespread economic gain for the region and the country.

213.    In this respect, the Pick-Sloan Plan proved very successful.  Over the next six decades, the government's flood control policies and practices opened the way for extensive development of the Basin, including the development of farming.

214.    Given the causes of the River's pattern of bi-annual flooding and the existence of a braided, non-navigable river channel that would increase its flood-carrying capacity by promoting less lateral drainage from the River during high-water incidents, the Corps understood that it was necessary to manage the flow and drainage of the River in a manner that would promote bank stabilization and create a narrow and deep channel.

215.    In order to manage the flow and drainage of the River to maximize flood control and enhance navigation, the Corps adopted long-term policies and procedures for managing the River that explicitly recognized the priority of flood control over the interests of fish and wildlife.

216.    To provide flood control for the Basin, the Corps adopted policies and procedures that manipulated the storage and release of water in and from the System reservoirs on the upper River and constructed flow management structures that were designed:  (a) to stabilize the banks by protecting them from scouring, and (b) toreduce peak flows and increase low flows of the River.

217.    The Corps' original operational policies and procedures to provide flood control for the Basin were subsequently codified in a governing operation document known as the

Missouri River Master Water Control Manual (hereinafter "Master Manual") in 1960.  The policies and procedures of the 1960 Master Manual were carried over into the 1979 Master Manual, which remained in force until 2004.  The Master Manual governed the Corps' policies, procedures, and operations in managing the River and its surrounding Basin.  Eventually, the operational force of the Master Manual would be recognized by the courts.  From its inception, however, the Corps considered the Master Manual both an embodiment of its adopted policy and an operational manual to be followed in practice and procedure.

218.    The Corps' reservoir storage allocations and water release procedures in the Master Manual were determined from operational studies made on historical river flows and historical flood and drought events.  The 1960 and 1979 Master Manuals required the Corps to keep storage in the reservoirs at or below certain prescribed levels during the year to ensure there was enough storage capacity to handle the predicted runoff and to prevent flooding.  The Corps understood that the lower it kept the storage levels, the better it was for flood control.

219.    Along with and to facilitate flood control, the government embraced the idea of a "self-scouring navigation channel."  To realize the goal of the Pick-Sloan Act in encouraging development, the government needed to achieve two interrelated goals with respect to the River: controlling flooding and creating a navigable channel.  A self-scouring channel was viewed as a means for achieving both.  A self-scouring channel uses the controlled erosive forces of flowing water to scour the bottom of the river channel rather than the river banks, stabilizing the banks while deepening the channel, both of which the Corps understood and embraced as conducive to flood control and to the creation of a navigable channel.  A self-scouring channel also increased the flood-carrying capacity of the River.

220.    Below is a true and accurate depiction and cross-section of the "Self-Scouring Channel" that the Corps created by and through their policies and management practices.  The depiction shows the River near Indian Cave State Park in Holt County, Missouri, a short distance north of the farm owned by Plaintiff Ideker Farms, Inc., as shown in Paragraph 284 below.  The cross-section comparisons show this section of the River as it appeared in 1934, before the Corps tamed the River, and then in 1977, after the Corps had created the self-scouring channel and the newly accreted land which could be farmed.  This depiction and cross-section was prepared by the FWS:



221.    To further prevent flooding and to reinforce the self-scouring channel, the Corps also constructed various flow management structures, such as levees, wing dams, and dikes, which prevent the destabilization or degradation of the river banks.

222.    In a further effort to stabilize the river banks, the Corps straightened the River and eliminated the naturally-occurring "chutes" that diverted waters from the main channel, degraded the river banks, and increased flooding risks.  The Corps understood that chutes were not conducive to flood control or to creating a navigable river and, therefore, that the chutes had to be eliminated if those goals were to be achieved.

223.    The Corps also constructed a significant number of tributary reservoirs and levee projects, and specifically agricultural levee projects built in individual units along the river.  The levee structures were built with drainage structures to provide adequate internal drainage for agricultural development.   The Corps viewed the reservoirs and levees as "operating to supplement each other, . . . provid[ing] protection against floods equal to any of past record."

224.    For decades, the Corps' flood control on the River was very effective.  As the Corps would later state in the 2004 Master Manual, "Regulation provided by the System, augmented by upstream tributary reservoir storage, has virtually eliminated significant flood flows on the Missouri River in this reach."

**As Congress Planned, Farmers and Others Were Induced to
Move to the Basin and Invest in Farmland and Other
Economic Development in Reliance on Federal Flood Control**

225.    Congress recognized in 1944 that people would not adequately settle and invest in the Basin without the government offering the inducement of protection from flooding:  "If human beings are going to live and carry on their daily activities in the fertile valleys of our

rivers, their lives and property must be protected.  Local inhabitants and returning soldiers must have a sense of security if they are going to live in peace, build permanent homes, and contribute their share to the national welfare.  Moreover, industry cannot afford to venture into an area where overflow is expected annually, regardless of how attractive other conditions may be."

226.    The government also recognized that its goals of promoting increased population and the development of agriculture and industry in the Basin might require sublimating competing interests in recreation or otherwise:  "It is, for example, the view of the Bureau of Reclamation, that the waters of the River and its tributaries west of or entering above Sioux City are more useful to more people if utilized for domestic, agricultural, and industrial purposes than for navigation-improvement purposes.  To the extent that these uses are competitive, domestic, agricultural, and industrial uses should have preference."

227.    The government knew that flooding posed a serious risk to farming, limiting the willingness of farmers to invest further in developing the Basin, and chose to control flooding to promote farming because farming was deemed essential to the economic development of the Basin.  Flood control was therefore given the highest priority in the Corps' river management decisions and was codified as such in the Master Manual.

228.    Beginning in July 1948, the Secretary of Agriculture ordered an agricultural plan to be prepared that would integrate the activities of the Department relating to the development and utilization of lands in the Basin.

229.    The agricultural program was prepared by a field committee of representatives of various bureaus and included an inventory of land and water conservation and development needs in the Basin based on past experience and investigation.  The program created procedures

to integrate land management with upstream engineering to be applied to problem areas for flood control as well as to integrate the work of the Department of Agriculture with that of other federal agencies working in the Basin.  It also recommended a greatly accelerated program for the Basin that would keep pace with the engineering phases of the Pick-Sloan plan.

230.    Specifically, the program was designed to create improvement measures on grass- and cropland to reach all of the 582,000 farmers and ranchers then in the Basin and involved adoption of improved management and land use practices on 113 million acres of cropland as well as the seeding of 20 million acres to grass and legumes for rotation hay and pasture.  The program also directed agricultural extension activities be intensified to assist rural farmers to make maximum use of land newly protected from floods by levees and drains, to make best use of electric power, to apply accelerated flood-reduction measures, and to adjust farming to new crops, new markets and new methods.  Finally, it recommended special credit facilities to supplement private credit agencies in view of the expectation that farmers, ranchers and landowners would invest three to four dollars for every dollar of federal funds expended.  In 1949, Harry Steele of the Bureau of Agricultural Economics estimated that 2 million acres in the Basin would be given protection from floods and another 3 million acres would benefit from new or improved drainage facilities.

231.    All of these measures were designed to induce private investment in the area of development of land in the Basin for productive uses.

232.    By the mid-1970s, 85 percent of the floodplain between Sioux City and the mouth of the River was intensively cropped.

233.    As a result of the federal government's plan, as implemented by the Corps' policies and procedures, over 300,000 acres of River floodplain were converted to agricultural use, much of which previously had been fish and wildlife habitat and wetlands.  And, in keeping with the federal government's plan, the River watershed now contains more than 170,000 square miles of farmland, which is roughly one-fourth of all of the agricultural land in the United States. As the federal government had hoped, Corps management of the Basin, which prioritized flood control and navigation, has led to over 12,000,000 people now living in the Basin, many of whom are farmers or people who rely on agriculture to make a living.

## THE GOVERNMENT'S POLICY SHIFT

**The Government and the Corps Have Become Increasingly Aware that Their Longstanding Policies and Practices Regarding Flood Control Are Having Detrimental Effects on the Environment and Certain Native Species**

234.    When the Pick-Sloan Plan was authorized in 1944 and the River dams were subsequently constructed, a premium was placed on controlling floods and on promoting regional economic and population growth.  Like most federal government water projects, the dams on the Missouri River were authorized and built before the passage of modern environmental statutes such as the National Environmental Policy Act ("NEPA") (1969) and the Endangered Species Act ("ESA") (1973).   In recent years, however, in light of this environmental legislation and general awareness of environmental issues, the Corps has changed tack, focusing on and prioritizing environmental restoration and programs that address environmental problems associated with existing flood control projects.

235.    Between 1985 and October 1990, three species in the Basin—the interior least tern, the piping plover and the pallid sturgeon—were listed as "endangered species."  In 1989,

the Corps initiated its first study into the environmental impact associated with and resulting from the Corps' flood-control projects and operations commencing in 1944, and specifically the effects of channelization.

236.   As a result of the studies that it conducted between 1989 and 1990, and the advocacy efforts of various interest groups, the government began to recognize the adverse effects of channelization on certain endangered species in the floodplain of the Basin.  Without periodic flooding of the Basin, fluctuating river levels and shallower and slower moving waters, natural habitat for the pallid sturgeon, piping plover and least tern was depleted and natural breeding cycles were disrupted.

237.   To encourage the Corps to change its policies and practices, environmental groups argued that, as a result of the government's flood-control policies, which necessarily eliminated fluctuating river levels, a shallow braided river channel, and bi-annual flooding, the natural breeding cycles of native fish and wildlife species, including endangered species, were disrupted and fish and wildlife habitat and wetlands were lost.

238.   In support of their argument that the Corps' decades-old flood-control projects and operations had adversely affected the Basin ecosystem, environmental groups pointed to the 2002 National Research Council's observation that "Mainstem Projects, as well as the Bank Stabilization and Navigation Project, with other developments in the basin [had] resulted in significant physical and hydrological changes and transformed the Missouri River ecosystem." The environmental groups urged the Corps to take the River back to its more natural state—to restore the River ecosystem to its pre-federal flood control existence, favoring fish and wildlife interests.

239.    Environmental groups asserted that the Corps' channelization and control of the lower River had significantly reduced the transport of nutrient-rich sediment that was vital to maintaining fish and wildlife habitat, resulting in the elimination of acres of such habitat for agriculture.  They further asserted that, as a result of federal flood-control efforts, 300,000 acres of the Missouri floodplain, home to 150 species of fish and 300 species of birds, were converted to agricultural land.

240.    In 1992, the GAO issued a report to Congress recommending that the Corps change its priorities in managing the River.  It recommended that the Corps give greater priority to fish and wildlife and lesser priority to flood control.  The Corps initially rejected that recommendation, asserting that such a change could not be made without additional congressional authorization because, under the FCA, it was bound to prioritize flood control.  In taking that position, the Corps pointed to the statement of its Chief Engineer in 1957 in hearings before Congress in which he confirmed that the existing priorities, given the System purposes, had been used throughout the basic, long-range planning studies for the System since 1943.  In addition, he confirmed to Congress that, while fish and wildlife were given consideration in the Corps' System projects and operations, they were necessarily lower in priority than flood control.

241.    In 1999, Congress expanded the Corps' authorization for construction of the Missouri River Fish and Wildlife Mitigation Project ("the Mitigation Project"), as part of the Water Resources Development Act ("WRDA") of 1999.

242.    The stated purposes of the Mitigation Project were to mitigate or compensate for fish and wildlife habitat that was lost as a result of the Corps' channelization of the lower River

and to acquire, restore and preserve aquatic and terrestrial habitat on separate locations along the river in Nebraska, Iowa, Kansas and Missouri.

243.   The authorization of the Mitigation Project required the Corps to acquire and develop habitat on land within the Basin and to obtain the necessary property rights, including flowage easements, over approximately 166,750 acres of land from private willing sellers or public interests.

244.   The restoration was to be accomplished by reconstructing historic chutes and side channels, modifying existing dike structures, relocating levees, developing wetland areas, planting native grasses and trees, and managing the land and river for habitat purposes.  The plan also involved intentional periodic flooding of the Basin to allow nutrients from the floodplain to flow into the River, creating natural breeding areas for pallid sturgeon and encouraging sturgeon to reproduce more regularly.

245.   As part of the Mitigation Project, the Corps began buying up some land in the Basin, but it never acquired close to its goal of 166,750 acres.  Meanwhile, other developments led the Corps to change its policies and practices regarding flood control, even though it had not acquired necessary easements over or ownership of the land that would be affected.

246.   In 2000, the United States Fish and Wildlife Service ("FWS") issued a Biological Opinion ("2000 BiOp"), recommending drastic changes to the management of the River. It recommended that the Corps depart from its prior policies and practices favoring flood control in order to protect and restore wildlife habitat.  The purpose of these changes was to return the River to its more natural state in order to protect identified endangered species of fish and

wildlife, to take back fish and wildlife habitat lost to agriculture and industry, and to preserve natural wetlands.

247.    Specifically, the 2000 BiOp put forward the FWS's opinion that, in order to avoid jeopardizing the continued existence of the least tern, the piping plover, and the pallid sturgeon, it would be "necessary to: (a) implement flow (i.e., variability, volume, timing, and temperature) enhancement with the goal of providing the hydrologic conditions necessary for species reproduction and recruitment; (b) implement a concurrent habitat restoration program with the goal of restoring habitat quality, quantity, and diversity so that the benefits of adequate dynamic natural river processes are restored; (c) conduct a comprehensive endangered species habitat and monitoring program to better characterize habitat use . . .; and (d) establish an adaptive management framework to implement, evaluate, and modify the actions in response to variable river conditions, species responses, and increasing knowledge base."

248.    As to the flow enhancement, the FWS proposed that a spring rise and summer drawdown must be implemented from the Gavins Point Dam as well as a spring release from the Fort Peck Dam.  The FWS also determined that a "portion of the historic habitat base must be restored, enhanced, and conserved in the riverine sections that will benefit the listed birds and fish."  Additionally, it proposed the "unbalancing" of the upper three reservoirs to hold one reservoir low while maintaining one at average levels and another rising on a 3-year rotation. This proposed watershed change went against the Corps' prior flood control prioritization, which required keeping all reservoir levels low and balanced annually so that, "in extremely high inflow years, the excess water is distributed among the three so that one reservoir does not carry the burden of storing the high runoff."

249.    In the 2000 BiOp, the FWS admitted that, "[o]n the basis of priorities established in the Master Manual, between 1960 and 1986, flood control was the highest priority, and fish and wildlife and recreation were considered subservient to all other authorized project purposes." As the FWS stated, "the Master Manual has been the primary basis to guide day-to-day operational decisions."   In the 2000 BiOp, the FWS explicitly recognized that "competing multipurpose demands (e.g., navigation and flood control) may conflict with uniform or constrained peaking summer releases for terns and plovers in downstream areas.  Operations for reservoir project purposes (e.g., flood control) will often conflict with reservoir nesting habitat, as well as downstream habitat because balancing System storage can conflict with uniform and constrained hydropower peaking summer releases."

250.    The FWS, via the 2000 BiOp, along with various environmental groups, urged the government and the Corps to fund and begin work on ecosystem restoration or mitigation projects along the lower River.  Specifically, it urged the government and the Corps to restore the River to its more natural state, to give fish and wildlife greater priority and flood control lesser priority, and to take back agricultural land in the floodplain that had been converted from fish and wildlife habitat by the Corps' construction of the System and management of the River to provide flood control.

251.    The Corps well understood the dramatic shift in River management that the 2000 BiOp laid out.  According to the Corps, "[t]he [FWS] found in its 2000 Biological Opinion[,] and reaffirmed in its amended biological opinion [in 2003,] that lowering flows from Gavins Point Dam, by itself, will not provide all of the necessary shallow water habitat."

252.    The Corps described the FWS strictures as demanding a "multi-faceted" approach involving a combination of reservoir operational changes, structural modifications, and non-structural actions, and it understood the strictures of the 2000 BiOp to require that shallow-water habitat "be restored through flow management, increasing the top width of the channel (widening), restoring chutes and side channels, manipulation of summer flows, or combinations thereof." Thus, the Corps understood that habitat construction and bimodal pulses (i.e. flooding) needed to act together to restore habitat: "The [FWS] . . . recommended that the Corps operate the dams to create a periodic 'spring rise' that would scour sandbar islands in the River and provide a spawning cue for the pallid sturgeon. And the [FWS] called for 'low summer flows' that would expose more sandbar habitat and increase the amount of shallow water habitat."

253.    The Corps acknowledged the findings of the 2000 BiOp, but knew that compliance with it would undermine decades of flood control policies and practices and force the Corps to flood land it had previously protected and encouraged farmers and others to develop. In a press release accompanying the release of the 2000 BiOp, a Corps official acknowledged that elements of the opinion would "increase the risk of flooding."

254.    Perhaps because it knew that the changes called for in the 2000 BiOp would undo decades of flood control and endanger large swaths of productive, private property, the Corps did not take immediate steps to implement the recommended changes.

255.    In 2003, the FWS issued an amended Biological Opinion ("2003 Amended BiOp"). The 2003 Amended BiOp called for additional habitat construction for the pallid sturgeon as well as two annual spring floods (or "bimodal spring pulses") to be caused by releases of large bursts of water from Gavins Point Dam for the benefit of the pallid sturgeon.

The 2003 Amended BiOp presented the FWS's opinion that the then-current regulation of the River would jeopardize the continued existence of the endangered pallid sturgeon.

256.    In a June 2004 letter to the Corps' Brigadier General Grisoli, Robyn Thorson, a Regional Director at FWS, noted an agreement between the Corps and the FWS that "habitat construction benefits pallid sturgeon when it increases the diversity of main channel aquatic habitat (depths and velocities); improves the connection between river and floodplain; provides off-channel habitats for potential spawning areas; . . . and decreases the amount and impacts of 'hard structures' on the river, promoting a more natural river channel that can be used as a basis for future flow pulses that emulate a natural hydrograph and mimic the cut-and-fill alluviation associated with normal river meandering."   The extensive construction efforts—including the creation of "bank notches; dike notches, revetment notches, type b notches; dredging; pilot channels; chutes; and dike modifications"—were conceived as "restor[ing] missing pieces of the pallid sturgeon's living environment."   However, as Thorson stated, the "interventions were designed to function over a range of flows but are most effective at creating and maintaining suitable pallid sturgeon habitat at discharges approximately equal to full service."

257.    Although the Corps resisted the changes sought by the BiOp, because of the devastating impact they would have on flood control and the marked departure they would require from longstanding Corps policies and procedures in its management of the River, it was ultimately forced to relent.

258.    The Corps' hand was forced, in part, by a series of lawsuits brought by environmental groups and other special interests.   In June of 2003, a federal court decision held that the Master Manual is binding on the Corps in its management of the River, and ordered the

Corps to update the Master Manual to reflect its current policies and procedures for managing the River.  Lawsuits facing the Corps alleged that the Corps was required to bring its policies and practices in line with the BiOp and the ESA and so, to resolve those lawsuits and the ongoing policy arguments surrounding the River, the Corps ultimately departed from its longstanding policy and practice of prioritizing flood control, and drastically changed its Master Manual and its policies and practices to conform with the BiOp, gutting its longstanding flood-control practices in the process.

259.    General David Fastabend of the Corps stated:  "The Endangered Species Act tells me I have to respond to a biological opinion.  And the Fish and Wildlife Service has given us a biological opinion that tells us that the way the Corps runs the river right now puts three listed endangered species in jeopardy.  And they've given us a date of 2003 to implement flow changes."

**The Corps Implemented Significant Changes in Its Policy for Managing the River, Departing from Decades-old Policies and Practices Prioritizing Flood Control in Favor of New Policies and Practices Prioritizing Habitat Restoration**

260.    The Corps had determined that it was unlikely it could comply with the ESA and the BiOp without jeopardizing flood control.  Nevertheless, the Corps decided to comply with the ESA and the BiOp, notwithstanding the impact on flood control.  On March 29, 2004, the Corps released its 2004 Master Manual.  The 2004 Master Manual reflected several significant changes in Corps policy and procedures, many of which would not be implemented until 2006.

261.    In order to comply with the BiOp, per the 2004 revision to the 1979 Master Manual, the Corps initiated the Missouri River Recovery Implementation Program ("MRRIP"), which was to be implemented and coordinated by and through the Missouri River Recovery

Implementation Committee ("MRRIC").   After the 2006 revision to the Master Manual, the Corps initiated the Missouri River Recovery Program ("MRRP").

262.   To ensure compliance with the ESA and the BiOp, the Corps partnered and closely coordinated with the FWS in implementing both the MRRIP and the MRRP as well as in developing other recovery programs in furtherance of the BiOp.   As testified to by Jody Farhat, the Chief of the Missouri River Management Division, Northwestern Division of the Corps: "Well, the Biological Opinion lays out the criteria that we have to meet to comply to avoid jeopardy to the species.   On each individual year, we work with the Fish and Wildlife Service and the Basin stakeholders to decide how that money is spent across those different features of the Biological Opinion.   So they aren't directing individual projects, but [FWS officials] are directing the overall goal of the program, which is to preclude jeopardy to the pallid sturgeon and the least tern and the piping plover."

263.   The 2004 Master Manual called for bimodal spring pulses releasing water from the Mainstem System to "provide[] for spawning cues and floodplain connectivity in the latest spring and early summer," starting in March of 2006.   The government has described these spring pulses as a means "to operate the Missouri River system of dams and reservoirs to intentionally flood," and has acknowledged that "the flooding of the river will obviously have a lot of negative effects."

264.   In implementing its new policy, the Corps recognized that its shift in River management priorities was both an attempt to "overcome th[e] limitation" of a nearly 70-year policy of modifying "the lower Missouri River to make it more channelized, safer to navigate and less prone to flood," as well as a result of being "called on . . . to change the structure of the

River in the long term.  Modest changes to the operations of the dams are not enough —the Corps must get out on the lower River and make physical changes on the ground."  The Corps described its new efforts to transform the River as "unprecedented," and "the most extensive construction project on the lower Missouri River since the original bank stabilization and navigation channel work began in the 1930's.  The Corps described these changes as "essential first steps in a long-term plan to provide a more diverse Missouri River that will support the pallid sturgeon," going even above and beyond what the FWS had demanded in its 2003 BiOp.

265.    The Corps projected it would generate between 1,420 and 1,810 acres of new shallow water habitat on the lower River by July 1, 2004, but it conceded that it did not and could not conduct full surveys of each of the over 500 projects that it completed in the six months leading up to that date "because time and logistical constraints would not permit it." However, even as early as November of 2004, the Corps was aware that its physical changes to the river would cause flooding.

266.    The Corps continued changes in operational policy that were reflected in the adoption and issuance of the 2006 Master Manual.   Some of these changes had been outlined in the 2004 Master Manual, but were not set to be implemented until the Spring of 2006.  The 2006 Master Manual and the 2006 Annual Operation Plan, for the first time, included technical specifications for the changes and presented an immediately actionable operational plan to begin drastically altering Corps policy to favor environmental interests over flood control.

267.    Pursuant to the Corps' 2006 Master Manual, which remains in force today, the Corps made drastic changes to its policies and procedures for management of the Basin.

268.    After the Corps' 2004 and 2006 revisions to the Master Manual, flood control is no longer the express dominant purpose for the Corps' policies and procedures in managing the River.   Rather, contrary to the priority of purposes in the 1979 Master Manual, the current Manual does a complete reversal and states: "Congress did not assign a priority to [the recognized project purposes of the System – flood control, navigation, irrigation, hydropower, water supply, water quality, recreation, and fish and wildlife].   Instead, it was contemplated that the Corps . . . would balance these functions in order to obtain the optimum development and utilization of the water resources of the Basin to best serve the needs of the people."

269.    The Corps, in agreement and with the support of the FWS, in departing from its longstanding practices and revising its Master Manual, believed that the past management of the River had severely and permanently altered the pre-FCA hydrograph of the River, including the elimination of the pre-FCA bi-annual flooding.   The Corps and the FWS also agreed that, unless the Corps' post-FCA operating criteria and annual operating plans were changed to bring the River closer to its pre-FCA hydrograph, including restoring the bi-annual flooding of the River, the Basin ecosystem could not be recovered as needed to comply with the BiOp.

270.    These changes in Corps policies went beyond the Mitigation Project authorized by Congress in 1999 and altered the flooding patterns on the River from the preceding six decades.

271.    Pursuant to the 2006 Master Manual, the Corps implemented intentional spring flooding.   It altered its maintenance procedures regarding approximately 7,000 wing dams and the river's shorelines to promote shallower river banks and reforestation of wetlands.   The Corps altered its methodology for holding and releasing water in upstream reservoirs, leaving more

water (and, accordingly, less capacity to accommodate new water) in those reservoirs throughout the year.  The Corps understood that the combination of promoting shallower river banks and leaving more water in upstream reservoirs was likely to significantly increase the frequency and severity of flooding downstream.

272.    In addition to bi-modal spring pulses, the Corps also lowered wing dikes and revetments to allow the river to widen.  These changes were intended to promote erosion of the high bank of the river resulting in a wider main channel.  This shallow widening of the channel drastically reduced its flood-carrying capacity.  The Corps further undertook the notching of dikes along the river.  This notching led to erosion caused by the swirling water created by the notch.  Although some notching has taken place since 1975, in 2004, the Corps created as many notches as it had in the prior 17 years combined.   The chart below depicts the notches constructed by year:



**Figure 1-4: Notches Constructed by KCD Since 1975**

The number of notches constructed by width of notch and by decade is shown in Figure 1-5 below. The majority of notches are between 41- and 50-feet wide.

273.    The Corps created these notches to scour the banks and widen the River with full knowledge that such actions would increase the risk of more frequent and severe flooding of the Basin.  Indeed, this was one of the objectives: to produce flooding that would benefit fish and wildlife, despite the known risk to farmland and other agricultural and economic interests in the Basin.

274.    The Corps also restored chutes along the River that it had eliminated decades earlier.  The chutes restored by the Corps were wide and long parallel channels cut in the river banks, hundreds of feet wide at the mouth and extending for miles parallel to the River.  The chutes provided sandbar and island habitat for fish and wildlife, but encouraged the diversion of flow from the main channel, further reducing the flood-carrying capacity of the River channel.

275.    Below is a photograph of the Deroin Bend Chute located near Indian Cave State Park in Holt County, Missouri.  This chute is approximately 5 miles long and is located just a short distance from a farm owned by Plaintiff Ideker Farms, Inc. (see photo in Paragraph 284). This chute is similar to other chutes constructed by the Corps to duplicate the natural chutes or secondary channel of the River that existed before the Corps, focusing on flood control as directed by Congress, eliminated them:



276.    There are 63 chutes or mitigation sites that have been constructed by the Corps between Sioux City, Iowa, and St. Louis, Missouri, in recent years:  28 in Missouri, 20 in Iowa, 11 in Nebraska, and 4 in Kansas.  Holt County, Missouri, which has been hard hit by flooding in multiple years since 2006, has the most chutes of any county—6.  Atchison County, Missouri, immediately north of Holt County and bordering Iowa and Nebraska, has 3.  The lower Basin states, including Missouri, have sought to stop these reconstruction efforts by the Corps on the basis that they cause flooding.

277.    Finally, and perhaps most importantly, the Corps' 2004 and 2006 Master Manual revisions departed starkly from the approach in prior Master Manuals of setting forth specific management procedures designed to prioritize and optimize flood control.  Instead, the 2004 and

2006 Master Manuals afforded the Corps almost unlimited discretion in managing the River, under an approach referred to as "adaptive management." The adaptive management approach allowed the Corps to take unprecedented risks with flood control in its management of the River. Significantly, the 2006 Master Manual no longer refers to "flood control" to describe the Corps' approach to managing the River, referring instead to "flood risk reduction."

278.    The adaptive management approach drew strong criticism when it was adopted in 2004 over concerns about the drastic deviation and reduction it represented in flood protection for the Basin. U.S. Senator Kit Bond of Missouri stated: "With adaptive management there is no reliability on which people can count, and the master manual is an empty document which effectively turns ultimate management authority over to the Fish and Wildlife Service."

## THE ENSUING FLOODS

### As Foreseen, the Corps' Changes to Its Practices and Policies Led to Repeated and Atypical Flooding Causing Severe and Unprecedented Losses

279.    The flooding caused by the Corps' policy and procedural changes has led to devastating destruction to Plaintiffs' land and other property.

280.    Since the Corps implemented these policy and procedural changes in March of 2006, as provided by the 2004 and 2006 revisions to the 1979 Master Manual, the River has flooded the Basin every year, except 2009 and 2012 when there were severe droughts throughout the region.

281.    Localized recurring flooding occurred along the River from Andrew County, Missouri, to Monona County, Iowa, and Burt County, Nebraska, in 2007, 2008, 2010 and 2011.

282.    This unprecedented flooding progressively increased in size, severity and duration between 2007 to 2011. The years of 2007 and 2008 saw localized flooding in the Basin. The

flooding increased in severity in 2010 with widespread severe flooding and culminated in 2011 with one of the worst, if not the worst, flood in the history of the Basin.

283.    In 2011, overwhelming and unprecedented flooding caused extensive losses throughout the Basin.  Flooding below Gavins Point, in particular, occurred on a scale never before seen.  In that year, the Corps kept additional water in, and released water more slowly from, its upstream reservoirs to benefit environmental and recreational purposes, knowing that it would detract from flood control.  Flood control requires leaving reservoirs as empty as possible.

284.    The results were devastating to farmers in the Basin.  Below is a true and accurate photograph taken of one of the farms owned by Plaintiff Ideker Farms, Inc., during the 2011 flood.  The farm photographed is located in Holt County, Missouri, south of the small town of Corning, which was entirely flooded during the 2011 flood:



285.     Below is a true and accurate photograph of Plaintiff Lyle Hodde's home and farm west of Hamburg, Iowa, taken after the 2011 flood left several feet of sand deposited throughout 600 acres of his prime farmland:



The Hodde farm was located adjacent to the Hamburg chute or mitigation site constructed by the Corps.  When that chute was being proposed, Lyle Hodde warned the Corps that the construction of the chute in that location, upon high water, would lead to flooding of his farm on the other side of the Hamburg levee.  His concern was proven warranted when his farm was devastated by flooding in 2011.  The Hodde farm is now controlled by the Corps as a wildlife area since the land, once used for productive farming, was destroyed for that use.

286.   Below is a true and accurate photograph of the Basin in Northwest Missouri during the 2011 flood.



287.   Below is a true and accurate photograph of Interstate 29 north of Rock Port, Missouri, during the 2011 flood.  The interstate roadway was closed for an extended period of time disrupting commerce and closing many small businesses.   Some businesses never recovered.



288.    Below is a true and accurate photograph taken on June 15, 2011, of a farm located

near Blair, Nebraska.



289.    Below is a true and accurate photograph taken on July 20, 2012, near Nebraska City, Nebraska, a year after the 2011 flood, showing the sand deposited over many acres of what at one time was fertile farm ground.



290.    Below is a true and accurate photograph taken on June 24, 2011, at or near the Missouri Valley exit off of Interstate 29, north of Omaha, Nebraska.  As shown, this photograph depicts a critical interstate roadway leading nowhere.



291.   In 2011, flood waters also engulfed homes located in Dakota Dunes, South Dakota, causing great loss and destruction.   Dakota Dunes is located north and west of Sioux City, Iowa, just north of the Nebraska and Iowa borders.   Below is a true and accurate photograph of a portion of that area taken during the 2011 flood.



292.    Beginning in 2006, the Master Manual changed such that the Corps' operating criteria for releases from the Mainstem reservoirs no longer required that certain releases, including early releases, be made based upon the Corps' forecast of the annual runoff.  As a result of that departure from the prior mandatory release criteria, which departure was done to serve the interests of fish and wildlife, flooding has occurred from 2007 to the present that would not have occurred under the prior criteria that prioritized flood control.

293.    If flood control had been the chief priority for the Corps in managing the River in 2011, as it was before the changes implemented in 2004 and 2006, the upstream reservoirs would not have held the high water level they did in early 2011, and the release of water from those reservoirs would have started much earlier than it did.

294.    Starting in approximately 2008, the monthly average storage levels for reservoirs along the River increased markedly.  In 2011, the monthly average storage levels were more than 50% higher than they were in 2004.  In other words – the Corps was consistently holding half again as much water in its reservoirs in 2011 as it was in 2004.  This necessarily reduced the amount of capacity in the Corps reservoirs available for flood control by the same amount.

295.    The 1979 Master Manual provided that "the top storage zones [or the water management system] are provided for handling of the largest floods and will be reserved exclusively for this purpose."  The 1979 version of the Master Manual similarly allowed the Corps to manage the system to benefit other purposes, such as fish and wildlife preservation, only if such management would not cause "serious interference" with flood control. By de-prioritizing flood control in the 2004 and 2006 Master Manual revisions, the Corps eliminated its ability to handle weather events such as those that occurred in 2011. This directly contributed to the severity and duration of the flooding resulting from the implementation of the 2006 changes.

296.    The floodwaters in the 2011 flood covered the land for over 100 days, an unprecedented duration.  This unprecedented flooding occurred even though it was a dry spring on the lower half of the River.

297.    Despite the runoff amounts that did not lead to flooding in previous years, severe flooding also occurred in 2010 throughout the lower Basin.  Flooding, although not as severe as that in either 2010 or 2011, also occurred in 2007 and 2008, with runoff amounts that should not have led to any flooding.  The severity of the flooding increased from one flood to the next.

298.    In 2013, despite the Basin south of Sioux City continuing to experience drought, localized flooding occurred along the River in Iowa, Nebraska, Missouri, and Kansas, including

on lands owned by some of the Plaintiffs.  As one example, the River adjacent to the farm owned by Plaintiff Ideker Farms, Inc., in Holt County, Missouri, south of the 5-mile long Deroin Bend Chute (see Paragraph 275), reached flood stage and flowed out of its banks in May 2013.  For Ideker, the flooding in 2013 represented the fifth flood of their land in seven years – only during the severe drought years of 2009 and 2012 was Ideker not flooded.

299.   Since the 2011 flood, the Corps has halted the "spring pulses," or the intentional spring flooding of the River.

300.   The post-2006 floods, and the increased severity and duration of these floods, were the direct result of the Corps' changes to its longstanding policies and procedures for managing the River.  As a key officer of the Corps explained regarding the 2011 floods, the flooding occurred because snow and rain fell on the areas feeding into the upper parts of the River, resulting in heavy runoff, and due to the policy changes the Corps had "lost the room that [the Corps] had saved in the reservoirs for it."

301.   If the Corps had followed its decades-old flood control policies and practices, instead of the new policies and practices implemented in the 2004 and 2006 revisions to the Master Manual, the post-2006 flooding could have been avoided altogether or, at a minimum, lessened in duration and severity.  In any event, Plaintiffs' land and other property would not have been severely invaded and destroyed, as it was as a result of the Corps' changed policies and procedures.

302.   Prior to 2006, under the Corps' longstanding flood control policy, designed to provide maximum flood control, the region experienced similar weather patterns without significant flooding.  For example, in 1997, the River was subjected to the highest levels of

runoff in its history (until 2011).  But, the Corps responded to the high amount of water in System storage and the predicted runoff from snowmelt in the mountains and spring rains by making releases in accord with the 1979 Master Manual–high-volume releases that were consistent with the predicted runoff.  The government later admitted that this decision "proved very beneficial as the total runoff for the year was the greatest on record and the highest releases on record were required later in the year to move this record runoff."

303.    Most of the locations that were regularly flooded post-2006 had rarely, if ever, experienced any flooding under the Corps' previous decades-old river management policies and procedures.  In fact, until the Corps' departure from its longstanding policies and procedures in 2006, the Basin had only experienced localized flooding due to overflows of the River twice, once in 1952 and once in 1993.

304.    The post-2006 floods have jeopardized the continuing viability of farms on much of the land along the River.

305.    The Corps could have eliminated or reduced the impact of recent floods, including the 2011 flood in particular, with more storage capacity and higher releases before the floods, but it decided, as reflected in the 2006 Master Manual, to prioritize its environmental restoration efforts over flood control, in contravention of its longstanding past policies and procedures.

### Flooding of Plaintiffs' Land and Property Was the Direct, Natural, and Probable Result of the Corps' Change in Policy

306.    The Corps departed from its longstanding policies and procedures for managing the River knowing full well that they would increase the frequency and severity of floods in the Basin.  Essentially, the federal government changed its policies and procedures to choose

environmental interests over flood control, and to sacrifice Plaintiffs' land and other property in the process.

307.    The Corps knew that, in order for its management actions to effectively restore the lost wetlands and wildlife habitat, it would have to somewhat restore the River's natural hydrograph and reintroduce regular bi-annual flooding.  It further knew that this would require a significantly wider public corridor in some portions of the channel than existed in 2002, and that this would impact those who live and work along the River, in some cases requiring relocation.

308.    The Corps also knew that the new management plan for the River would inflict losses on agriculture in the Basin and that some higher flows at certain times could increase those losses.    A study commissioned by the Corps noted:  "efforts to restore natural physical processes and ecosystems may require occasional high flows from mainstem reservoirs that increase flooding and interfere with agricultural drainage."  That same study found:  "[T]here may be winners and losers in a new operations scheme who will need to be carefully considered and perhaps compensated."   In fact, the express purpose of many of the policy and procedural changes was to impact the land in the Basin to recover that agricultural land for wetlands and wildlife habitat.

309.    The Corps has described these spring pulses as "intentional floods" and has acknowledged that they will "obviously have a lot of negative effects."  On April 11, 2005, in response to a question from the Honorable C. Arlen Beam in a case related to the Corps' management of the River, as to whether under the 2006 Master Manual the Corps would be engaging in intentional flooding of property adjacent to the River, Corps' counsel (James A. Maysonett) stated:  "Yes, that's correct.  That's—that's part of the concept of the spring rise is

that historically the flooding of the river will obviously have a lot of negative effects.  It will also have positive effects for these species."

310.    Mr. Maysonett went on to state:  "[H]ow can we do this without, as you noted, you know, potentially washing away Omaha?  That's obviously one of the crucial issues in defining the terms of the spring rise are how can we do this while protecting private properties. So, as I understand it, yes.  The Corps is acquiring easements to—so that this flooding will occur not on private property—not in Omaha, but—but at parts of the river where it's appropriate." Although the Corps carried through on its promise to implement regular flooding, that flooding was not limited to public properties.

311.    There were few, if any, flowage easements acquired by the Corps (and none in Northwest Missouri) between the Gavins Point Dam and St. Louis prior to the 2011 flood.

312.    At that same hearing, counsel for the Corps acknowledged that the notion of intentionally flooding the Basin as a departure from the status quo and as part of a new policy and procedure for the Corps:  "The idea that you would, for example, operate the Missouri River system of dams and reservoirs to intentionally flood—that is to create a spring rise.  It—it's only in the last few decades that scientists have come to the conclusion that these changes in the hydrograph are important to the ecological processes of the river and to these species."

313.    The natural physical state of the River, before the federal government undertook flood control, was a "braided channel," consisting of a main channel, a secondary channel, and an island channel complex, which was very shallow and essentially guaranteed frequent flooding in the Basin.  The "braided channel" is illustrated in Paragraph 220 above in the photo/chart depicting the "Cross-Section" of the Missouri River in September 1934.  This "braided channel"

stands in stark contrast to the self-scouring channel the Corps created over decades in order to promote flood control.

314.    The Corps' plan to return the River to a more natural state encompassed an intent and knowledge that this would encompass regular flooding of the Basin.  Specifically, the Corps knew that, as a result of its changed policies and procedures, there would be additional loss and destruction to flooded properties in the Basin and that there would likely be drainage problems in the floodplains that had been eliminated as a result of the Corps' prior policies and procedures.

315.    During meetings between the Corps and River stakeholders following the 2011 flood to address the Corps' 2011-12 Annual Operating Plan and to address River stakeholders' concerns about the Corps' management of the River, attendees were told by General McMahon of the Corps that they would have to "do their part."  At the meeting hosted by the Corps on October 25, 2011, at the Holiday Inn Riverfront in St. Joseph, Missouri, when pressed about what that meant, General McMahon responded to a group of farmers:  "Your part is to move out of the floodplain and don't live there."

### The Corps' Policy Changes Have Interfered With Plaintiffs' Reasonable Investment-Backed Expectations

316.    The flooding caused by the Corps' changed River management policies and practices has imposed a severe burden on Plaintiffs' land and other property, profoundly disrupting and interfering with Plaintiffs' reasonable expectations of the intended and customary use of that property.

317.    By the government's design and at its urging, the Plaintiffs have made significant investment of time and resources in the land and other property now devastated by the Corps'

actions.  These investments were made based on the expectation that the Corps would continue to manage the river as it had for 60 years, prioritizing flood control.

318.    After 60 years, however, the Corps changed its River management policies and procedures and, in doing so, it upset the Plaintiffs' reasonable, investment-backed expectations that flood control would continue to be the Corps' first priority (as per the 1979 Master Manual) in managing the River.

319.    Before its departure from its longstanding policies and procedures, the Corps knew that landowners in the Basin had reasonable expectations, based on 60 years of past policies and procedures intentionally cultivated by the government, that the federal government would continue to provide and prioritize flood control in the Basin.

320.    For these reasons, a study commissioned by the Corps recommended:  "Future restoration efforts must recognize the necessity to work closely with floodplain residents to both minimize their vulnerability to floods and to ensure appropriate compensation for damages they might sustain or for property used in restoration efforts . . . . as [the restoration efforts] may entail significant monetary and psychological costs."  Despite this recognition, the Corps was inconsistent in communications about compensation.  When communicating one-on-one with certain landowners in affected areas, the Corps would notify them by letter that it was pursuing land and easement purchases along the river to complete its authorized projects to comply with the BiOp.  However, in public settings, the Corps would notify landowners that they would not be entitled to compensation as a result of flooding.

321.    For example, in a public meeting on November 14, 2005 in Nebraska City, Nebraska, Larry Cieslik, the Chief of the Basin, Water Management Division of the Army Corps

of Engineers responsible for drafting the AOP for 2005-2006, was asked by a farmer, Dave Mincer of Mincer Farms, whether there would be compensation to farmers for their losses if the Corps' experiment "gets out of control."  Mincer stated that he would feel more comfortable if there was a process for compensation in place.  Cieslik responded, "There is no mechanism in place for compensation, just like there is no mechanism for compensation if damages occur now. Congress would have to provide authority and funding."

322.    Despite such statements, the Corps was haphazardly attempting to acquire flowage easements over private landowners' affected land, knowing full well that its change in River management policies and procedures would result in unprecedented flooding to Plaintiffs' land in the Basin.

323.    In 2013, the Corps was still sending letters to landowners in the affected areas "seeking willing sellers of land along the river to complete this authorized project."  Ironically, however, now that the Corps' policy changes have had devastating impact on these unacquired parcels, the Corps has renewed its efforts to buy parcels at a greatly reduced value due to the loss and destruction the Corps' own policies have inflicted.

## CAUSE OF ACTION

### Cause 1:  The Corps Took Plaintiffs' Land and Property without Just Compensation in Violation of the Fifth Amendment of the United States Constitution

324.    Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

325.    Plaintiffs have a legally-recognized property interest in their land and other property, and the economic benefits associated with that property, located in the Basin.

326. Plaintiffs had distinct, reasonable, investment-backed expectations that their property would only be subject to flooding in line with historical flooding patterns established over the past six decades of the Corps' policies and procedures for management of the River.

327. Since 2006, atypical flooding and an increased risk of flooding have significantly interfered with that property interest and upset Plaintiffs' reasonable, investment-backed expectations on a temporary and permanent basis.

328. That flooding and increased risk of flooding is and has been a direct and foreseeable result of policy and procedural changes implemented by the Corps beginning in 2006.

329. The Corps implemented these policy and procedural changes for the purpose of achieving a public good, namely restoring the River ecosystem to protect identified endangered fish and wildlife species, to restore lost fish and wildlife habitat, and to protect wetlands.

330. Since 2006, Plaintiffs' property has been subjected to atypical and recurring flooding that would not otherwise have occurred and flooding of substantially greater severity and duration than flooding that would have otherwise occurred.

331. By fundamentally changing its River management policies in 2006, the Corps caused increased flooding, increased risk of flooding, and increased severity and duration of flooding of Plaintiffs' land and property, interfering with Plaintiffs' reasonable, investment-backed expectations.

332.    The Corps knew or should have known that its change in River management policies would result in increased flooding, increased risk of flooding, and increased severity and duration of flooding of Plaintiffs' land and property.

333.    Such increased flooding, increased risk of flooding, and increased severity and duration of flooding of Plaintiffs' land and property was the direct, natural, probable, and foreseeable result of the Corps' actions.

334.    The increased flooding, increased risk of flooding, and increased severity and duration of flooding of Plaintiffs' land and property has interfered with Plaintiffs' property interests for a substantial period of time and, in some instances, permanently destroyed Plaintiffs' property or permanently deprived Plaintiffs of the use and enjoyment of their property.

335.    The Corps took flowage easements over Plaintiffs' land without just compensation.

336.    The Corps took Plaintiffs' property for a public purpose.

337.    The Corps' actions are attributable to the United States.

338.    The United States government has not provided Plaintiffs with just compensation for its taking of Plaintiffs' property.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf, against the Defendant, adjudging and decreeing that:

    A.  Defendant took Plaintiffs' property without just compensation in violation of the Fifth Amendment of the United States Constitution;

    B.  Judgment be entered against the Defendants and in favor of Plaintiffs for compensation for the property right taken from them, together with the costs of suit, including reasonable attorneys' fees;

    C.  Plaintiffs be awarded just compensation for their deprivation and losses;

    D.  Plaintiffs have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated: March 5, 2014

Respectfully submitted,

R. Dan Boulware
 *Attorney of Record*
Edwin H. Smith
 *Of Counsel*
Seth C. Wright
 *Of Counsel*
Polsinelli PC
3101 Frederick Avenue
St. Joseph, MO 64506
Telephone: (816) 364-2117   Fax: (816) 279-3977
E-mail:dboulware@polsinelli.com
   esmith@polsinelli.com
   scwright@polsinelli.com


Benjamin D. Brown
 *Of Counsel*
Laura Alexander
 *Of Counsel*
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, NW
Suite 500 W
Washington, D.C. 20005
Telephone: 202-408-4600    Fax: 202-408-4699
E-mail:bbrown@cohenmilstein.com
   lalexander@cohenmilstein.com