# In the United States Court of Federal Claims

No. 14-183L
(Filed: March 11, 2019)

|  |  |  |
|---|---|---|
| IDEKER FARMS, INC., et al., | ) | |
| | ) | Motion for Reconsideration; Fifth |
| Plaintiffs, | ) | Amendment Taking; Missouri River; |
| | ) | Flooding; Liability; Causation. |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*R. Dan Boulware*, St. Joseph, MO, for plaintiffs.  *Edwin H. Smith*, *Seth C. Wright*, and, *R. Todd Ehlert*, St. Joseph, MO, and *Benjamin D. Brown* and *Laura Alexander*, Washington, D.C., of counsel.

*Terry M. Petrie*, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., with whom was *Jeffrey H. Wood*, Acting Assistant Attorney General, for defendant.  *Jacqueline C. Brown*, *Laura W. Duncan*, *Carter F. Thurman*, and *Daniela A.* Arregui, Washington, D.C., of counsel.

## OPINION ON MOTION FOR RECONSIDERATION

**FIRESTONE**, *Senior Judge*

This Fifth Amendment takings action was brought by farmers, landowners, and business owners from six states claiming that changes the United States Corps of Engineers (the "Corps") has made to its operations on the Missouri River ("River") after 2004 have resulted in the taking of flowage easements on their properties without just compensation in contravention of the Fifth Amendment to the United States Constitution.

The plaintiffs claim that the Corps has made changes to the Missouri River ("River Changes") in order to implement the Missouri River Recovery Program ("MRRP") and changes to the operation of the dams and reservoirs that make up the Missouri River Mainstem Reservoir System ("System Changes") in order to comply with, among other things, the Corps' obligations to protect fish and wildlife species and their habitat.  The plaintiffs claim that these River and System Changes together have caused new and increased flooding on their properties and filed the pending action to obtain just compensation for this new and increased flooding.

The court divided the litigation into two phases.  In Phase I, a group of 44 representative plaintiffs with properties at various locations along the River from North Dakota to Missouri were selected and were given the burden of proving whether the Corps caused additional flooding or made flooding on their properties more severe for each of the years at issue than would have existed if the Corps had not implemented the River and System Changes after 2004.  In Phase I, the representative plaintiffs also had to address whether the flooding for the years at issue at each of the representative plaintiffs' properties was a foreseeable result of the Corps' River and System Changes.

The court's factual findings and legal conclusions are described in detail in the court's 103—page opinion.  *Ideker Farms, Inc. v. United* States, 136 Fed. Cl. 654 (2018).  As discussed in the opinion, the Corps' River Changes under the MRRP involve the Corps' actions to avoid jeopardizing three federally listed species under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*: the piping plover, the interior least tern, and the pallid sturgeon. *Id.* at 666-670.  The MRRP includes implementation of the Bank

Stabilization and Navigation Fish and Wildlife Mitigation Project ("Project") which the court labeled River Changes. *Id.* at 665.  Under this Project, the Corps has constructed various mitigation projects along the River and has removed and modified various structures previously built by the Corps, for navigation and flood control, in order to create species habitat.[1]

The System Changes at issue in this litigation were also implemented by the Corps to address the Corps' obligations to avoid jeopardizing the above-identified threatened and endangered species. To meets its environmental obligations, the Corps made certain releases to benefit species at various times throughout the year to either encourage or discourage nesting or spawning. *Id.* at 669.  As part of this effort, the Corps at times maintained a greater amount of water in the System reservoirs for the benefit of fish and wildlife than it had before 2004. *Id.* at 668-69. In this connection, the Corps' post-2004 Master Manuals ("new Master Manual"), which govern the Corps' System operations, clarified that flood control was no longer considered the Corps' highest System priority

---

[1] In its opinion the court, as a short-hand, referred to the Corps' actions to implement the MRRP as actions to meet the Corps' obligations to comply with the Endangered Species Act by returning the River to a more natural habitat. *Ideker Farms, Inc.,* 136 Fed. Cl. at 665 (The MRRP "is the Corps' umbrella program for returning the Missouri River to a more natural state to aid in the recovery of the Missouri River Basin ecosystem") As discussed *infra,* the plaintiffs argue that the court was clearly erroneous in finding that flooding in 2011 was not connected to the Corps' actions to comply with the ESA. The plaintiffs contend that the 2011 flooding was caused by the Corps having to change priorities to meet its obligations under the MRRP. Specifically, the plaintiffs argued that "[e]very one of the years of flooding that we claim has the very same theory . . . of combined and cumulative effects . . . of the MRRP designed to work in combination to achieve the MRRP purpose." Oral Arg. Trans. 11:25-12:8. The court determined based on the evidence at trial that the plaintiffs were not able to prove that the flooding in 2011 was "caused" by the Corps' System or River Changes to implement the MRRP. Those findings and conclusions were all supported by relevant and reliable evidence presented to the court and as discussed *infra* were not clearly erroneous.

but rather was one of the System's several priorities to be balanced, until flooding concerns become "imminent" and then flood control would be the highest priority. *Id.* at 691.

The plaintiffs produced evidence to show more flooding had occurred on their properties at various times in 2007, 2008, 2010, 2011, 2013, and 2014, than had occurred before the System and River Changes were made. They presented expert testimony and government witness testimony to show the Corps made releases from the System during periods of high River flows to benefit species which contributed to even higher River levels, and the higher River levels led to greater flooding than would have otherwise occurred during high water events. Additionally, the plaintiffs produced expert and other testimony to show that the changes made to the River under the MRRP, which as noted is aimed at returning the Missouri River to a more natural state, also contributed to raised water levels in the River and caused greater flooding. *Id.* at 695-96.

The government presented evidence to counter the plaintiffs' causation evidence for each of the years in question. *Id.* at 709-711. The government's experts opined based on their studies that the Corps' River and System Changes did not cause higher water levels on the River and did not cause any new or increased flooding from what would have been expected had the Corps not made the System and River Changes. *Id.* at 706-12.

The experts for both the plaintiffs and the government offered their opinions based on a comparison of flooding that occurred after 2004 with the Corps' System and River Changes as compared to the flooding that would have taken place without those System and River Changes. All of the experts assumed for purposes of their analyses that the "but

for" world for comparison purposes included the System flood control protections built and operated by the Corps under its pre-2004 Master Manuals together with all of the River flood control protections in place prior to 2004.

On March 13, 2018, after 55 days of trial, this court issued its opinion with findings of fact and conclusions of law regarding causation and foreseeability of the flooding on each of the 44 representative plaintiffs' properties.  The court found that many of the representative plaintiffs had established causation and foreseeability in connection with flooding that had occurred on their properties for 2007, 2008, 2010, 2013 and 2014. *See id.* at 762-63. The court concluded, however, that none of the plaintiffs had established causation for the flooding that inundated their properties in 2011. *Id.* at 690-94, 723.

Regarding flooding in 2011, the court found that the cause of the flooding in 2011 was the release of unprecedented volumes of water from Missouri River System dams occasioned by the unprecedented amount of snowmelt and rain that had flowed into the Missouri River Mainstem Reservoir System during the spring of 2011. *Id.* at 690. The court concluded as a matter of fact that the 2011 flooding and the levee failures that caused even greater flooding during that year were not caused by the Corps' change in operations under the new Master Manual. *Id.* at 693.  The court rejected the plaintiffs' contention that a comparison of what would have happened had the Corps followed its 1979 Master Manual instead of the new Master Manual proved that the 2011 flooding would not have been as severe had the Corps not implemented the changes in the new Master Manual. *Id.* at 691-93. The court found that the plaintiffs' expert analysis was

based on unsupported assumptions regarding the differences between the inflows into the System reservoirs in 2011 and in 1997, the years plaintiffs' expert used to support his analysis of the differences between the 1979 Master Manual and new Master Manual. *Id.* Specifically, the court explained that it rejected the comparison of 1997 to 2011 for causation purposes because 2011 was colder and as a result the inflows to the reservoirs in 2011 were lower in March and April than in 1997 and the total volume of runoff in 2011 was 20 percent higher than in 1997 and thus the two years could not be fairly equated. *Id.*

The evidence presented by the government established that the unprecedented and unforeseeable inflows into the reservoirs in 2011 exceeded the capacity of the System by a significant amount.  *Id*. The evidence demonstrated that the System was designed to control inflows of up to 40 million acre-feet and in 2011 the inflows exceeded 60.8 million-acre feet.  *Id* at 690. The court rejected the plaintiffs' expert testimony that the Corps would have released water from the reservoirs earlier but for the MRRP and accepted the government's contention that the Corps had no reason to start releasing water earlier from the reservoirs in order to accommodate the record-setting inflows that happened later in the season. *Id.* at 693. For this reason, the court determined, that the plaintiffs were in effect arguing that it was the Corps' failure to act and properly manage the 2011 flood which led to flooding of their property in 2011. The court explained that challenges to the Corps' failure to act or properly manage the 2011 flood sound in tort, regardless of how plaintiffs characterized their claims, and this court does not have jurisdiction over tort claims. *Id.* at 693.

Regarding the taking claims for 2007, 2008, 2010, 2013, and 2014, after considering the parties' expert testimony and other lay and government witnesses, the court concluded that some of the plaintiffs had met their burden of proving causation. The court again based its causation conclusions on the comparisons made by the experts of the flooding that would have occurred for each year in the aforementioned "but for" world without the System and River Changes and the actual world with those changes. Both parties' experts, as noted above, assumed that the flood control protections that had been part of the Corps' Missouri River program before 2004 were in place when making their comparisons between the "but for" and actual world.

Both the plaintiffs and government have moved for reconsideration of the court's Phase I decision. The plaintiffs argue in their motion that the court erred in rejecting their causation evidence for the 2011 flood and various levee breaches in that year. (ECF No. 429).  The government argues that the court erred in finding that plaintiffs had met their causation burden for the flooding in 2007, 2008, 2010, 2013, and 2014. (ECF No. 436).

## I.   LEGAL STANDARDS FOR MOTIONS FOR RECONSIDERATION

Under Rule 59(a)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the court, "in its discretion, 'may grant a motion for reconsideration [,]'" if "'there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice.'"  *Biery v. United States*, 818 F.3d 704, 711 (Fed. Cir. 2016) (quoting *Young* v. *United States,* 94 Fed. Cl. 671, 674 (2010)).  The Supreme Court has held that motions for reconsideration "may not be used to relitigate old matters, or to raise arguments or present evidence that

could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 (2d ed. 1995)); s*ee also Lone Star Indus., Inc. v. United States*, 111 Fed. Cl. 257, 259 (2013) ("A Rule 59 motion 'must be based upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court.'") (quoting *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298, 300 (1999)).  "A court . . . will *not* grant a motion for reconsideration if the movant 'merely reasserts . . . arguments previously made . . . all of which were carefully considered by the Court.'" *Ammex, Inc. v. United States*, 52 Fed. Cl. 555, 557 (2002) (quoting *Principal Mut. Life Ins. Co. v. United States*, 29 Fed. Cl. 157, 164 (1993)).  Rather, "the movant must point to a manifest (i.e., clearly apparent or obvious) error of law or a mistake of fact." *Id.* (citing *Principal Mut. Life Ins. Co.*, 29 Fed. Cl. at 164); *Lucier v. United States*, 138 Fed. Cl. 793, 798-99 (2018).  "'Manifest,' as in 'manifest injustice,' is defined as clearly apparent or obvious," *Lucier*, 138 Fed. Cl. at 799 (quoting *Ammex*, 52 Fed. Cl. at 557), and therefore, as the court recently explained, a party "seek[ing] reconsideration on the ground of manifest injustice, . . . cannot prevail unless it demonstrates that any injustice is apparent to the point of being almost indisputable." *Id.* (citations and internal quotation marks omitted).

## II.   *ST. BERNARD PARISH* IS AN INERVENING CHANGE IN CONTROLLING LAW

Shortly after the parties' reconsideration motions were filed, the Federal Circuit issued its decision in *St. Bernard Parish v. United States,* 887 F.3d 1354 (Fed. Cir. 2018),

*cert denied*. No. 18-359, 2019 WL 113112 (U.S. Jan. 7, 2019).  In *St. Bernard Parish,*

which involved flooding in connection with Hurricane Katrina, the Federal Circuit

addressed several legal issues that are also at issue in this case. Specifically, the Circuit

clarified the standard and proof needed to establish causation when the government is

sued for a taking based on flooding. The parties have briefed the legal implications of *St.*

*Bernard Parish* on this case.

In *St. Bernard Parish*, the Federal Circuit was asked to address whether the

government's failure to maintain a channel, the Mississippi River-Gulf Outlet

("MRGO"), along the Mississippi River in the City of New Orleans could support a

taking claim where the failure to maintain and manage the channel was shown to have

caused erosion and the eventual destruction of a levee which had historically protected

the plaintiffs from past flooding. In reversing the trial court and rejecting the plaintiffs'

takings claims on the theory presented, the Federal Circuit addressed several legal issues

relevant to the pending case.  These include the following.

First, the Circuit made clear that the "government cannot be liable for failure to

act, but only for affirmative acts . . . ."  *St. Bernard*, 887 F.3d at 1360.  The Circuit

explained that "in the flooding context . . . precedent [has] uniformly based potential

takings claims on affirmative government acts." *Id.* at 1361 (citing the Supreme Court's

decision in *Ark. Game & Fish Comm'n v. United States,* 568 U.S. 23, 27-8 (2012) (the

affirmative act of the government releasing water from a government constructed dam)

and the Federal Circuit's decision *Ridgeline v. United States,* 346 F.3d 1346, 1351, 1355

(Fed. Cir. 2003) (government construction of a parking facility increased storm water

runoff)). Quoting from the Supreme Court's decision in *Sponenbarger*, the Circuit however noted that government cannot be held liable for a taking if the government's flood reducing actions do not provide adequate flood protection. *Id.* at 1361 (quoting *United States v. Sponenbarger,* 308 U.S. 256, 265 (1939) ("[w]hen undertaking to safeguard a large area from existing flood hazards, the Government does not owe compensation under the Fifth Amendment to every landowner which it fails to or cannot be protected.")).  The Circuit explained that a plaintiff's remedy for the government's failure to act in this instance, "lies in tort." *Id.* at 1362.

Second, the Circuit explained that "causation requires a showing of 'what would have occurred' if the government had not acted." *Id.* (citing *United States v. Archer,* 241 U.S. 119, 132 (1916)).  "In order to establish causation, a plaintiff must show that in the ordinary course of events, absent government action, plaintiffs would not have suffered the injury." *Id.*  Citing several flooding cases, the Circuit explained that to establish causation a plaintiff must establish what damage would have occurred without the government having taken any action in connection with decreasing as well as increasing the alleged flooding risk. The Circuit noted for example, that in *Arkansas Game* where the government had constructed a dam and then allowed for releases that resulted in down-stream flooding that to establish causation, "'the proper comparison would be between the flooding that occurred prior to the construction of the [dam] and the flooding that occurred during the deviation period,' emphasizing that the causation analysis considers causation based on the entirety of the government action, not merely the deviation from the original water-release policy." *Id.* at 1364-65 (quoting *Ark. Game,*

10

736 F.3d at 1372 n.2).[2] The Circuit also cited a litany of cases from the Circuit and this court to the effect that where similar flooding would have happened without any government action that flooding takings claims fail. *Id.* at 1363, n. 8.[3]

Third, the Circuit discussed how the "but for" world should be approached where the government takes actions that both decrease and increase flood risks to property. The Circuit stated that if the government has taken actions that have increased the risk of flooding and other actions that have decreased the risk of flooding, the plaintiff, to establish causation, must take into consideration both the government sets of actions - those that have increased flooding and those that decreased the risk of flooding in the "but for" world analysis to prove causation. *Id.* at 1365 ("Thus, the causation analysis must consider both risk-increasing and risk-decreasing government actions over a period of time[.]"). In this connection, the Circuit explained that government actions that have decreased flooding must be considered together with government actions that have increased flooding as long as the "government actions [are] directed to the same risk that

---

[2] In this connection, the Federal Circuit noted that the dam in *Arkansas Game* was designed to maintain pre-dam river flow. *St. Bernard*, 887 F.3d at 1365 n. 11 ("[T]he original water-release policy (before the deviation) mimicked the pre-dam water flows. Therefore comparing the flooding that occurred with the deviation to the flooding that would have occurred under the original water-release policy, rather than to what would have occurred before the dam was built, had no impact on the outcome.").

[3] *Bartz v. United States*, 633 F.2d 571, 577 (Ct. Cl. 1980) (finding no taking when "excessive precipitation was the root cause of the flooding experienced by plaintiffs," and in most instances, flooding "would in all likelihood have happened without the existence of the upstream dam"); *ARK-MO Farms, Inc. v. United States*, 530 F.2d 1384, 1386 (Ct. Cl. 1976) ("No proof was made that [the dam] or any other consequence of the [government] project was the cause of the floods complained of. This failure of proof would alone dispose of plaintiff's case."); *Coates v. United States*, 110 F.Supp. 471, 475 (Ct. Cl. 1953) (no taking where "plaintiffs have not been able to establish that the land would not have been flooded had there been no dikes").

is alleged to have caused the injury to the plaintiffs." *Id*. The Circuit cited *John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct. Cl. 1972) to explain why in *Hardwicke*, as in *St. Bernard Parish*, the government's flood increasing and flood decreasing actions were sufficiently related to be considered together in a "but for" analysis.  The Circuit explained that in evaluating the relatedness of government action, relatedness means that the government actions are related to the same risk, i.e. flooding from the same body of water. *Id*.  The Circuit rejected the argument advanced by the landowners that the government's flood increasing actions and the government's flood decreasing actions must be part of the same project. *Id.* (Plaintiffs "contend that the relevant beneficial government action must be part of the same project . . . That is not correct.").

Recognizing that a different "but for" world comparison might be appropriate where the government's flood increasing actions were taken *after* the government's risk reducing actions were taken, the Circuit left for another day how it would rule in that factual context. Citing *John B. Hardwicke*, in footnote 14 of its opinion, the Circuit noted that it has previously recognized in *dicta* that if the flood increasing government action comes after the flood reducing government action, the risk reducing action would still have to be considered in evaluating causation if the risk-increasing action was "contemplated" at the time the risk-reducing action was taken. *Id*. at 1367, n. 14.

In applying the Circuit's holdings in *St. Bernard Parish* to this case, the court **DENIES** both the plaintiffs' and the government's motions for reconsideration for the reasons that follow.

## III.    THE MOTIONS FOR RECONSIDERATION

### A.    Plaintiffs' Motion for Reconsideration Must Be Denied After *St. Bernard Parish*

The plaintiffs argue that the court erred in rejecting their claims for 2011 because the court erred in finding that plaintiffs had not established causation. The plaintiffs argue that "but for the Corps' change in priorities as to flood control under the [Corps'] new Master Manual, the change from a preemptive priority under the 1979 Master Manual to a reactive priority [regarding flood control], the peak System releases in the summer of 2011 would have been much smaller."  *See* Pls.' Mot. for Recon. at 5.  (ECF No. 429). The plaintiffs thus argue that the court erred in finding that the flooding in 2011 was not caused by the changes implemented by the Corps after 2004.

The government argues, in response, that under the causation standard now set by the Federal Circuit in *St. Bernard Parish*, plaintiffs' taking claims for 2011 and for all other years must be set aside. The government contends that under *St. Bernard Parish*, the plaintiffs had the burden of showing that the flooding plaintiffs experienced in the actual world would not have occurred in a "but for" world where all of the Corps' flood increasing and flood reducing actions are eliminated from consideration. The government argues because the plaintiffs failed to present any evidence of a "but for" world where the government's significant flood reducing actions on the Missouri River are eliminated from consideration together with the government's alleged post-2004 flood increasing actions, all of plaintiffs' takings claims fail and must be dismissed.

The plaintiffs concede that they did not compare the flooding that occurred in 2011 with what would have occurred in 2011 if the Missouri River System, the dams and reservoirs together with the River structures, and federal levees and federally-funded levees had never been built. They argue, however, that the government's reading of *St. Bernard Parish* goes too far. The plaintiffs argue that the *St. Bernard Parish* "but for" world test does not apply in this case because there is no nexus between the government's flood increasing actions and the government's flood reducing actions. Relying on the Circuit's discussion of *Hardwicke* in the text of the opinion, the plaintiffs argue because the Corps' post-2004 flood increasing actions are not related in time or purpose to the Corps' pre-2004 flood reducing actions, that the Corps' earlier flood reducing actions were properly considered as part of the baseline for comparing the pre-2004 with the post-2004 worlds, including 2011. Plaintiffs argue that the causation test articulated in *St. Bernard Parish* applies only where, as in *St. Bernard Parish*, the risk increasing actions of the government were directly tied to the government's flood reducing actions.

The government argues that plaintiffs' attempt to distinguish the pending case from *St. Bernard Parish* is not supported. The government argues that the government's flood reducing actions and flood increasing actions are directly tied to the same risk, flooding from the Missouri River, and that for this reason the flood reducing and flood increasing actions must be considered together. The government further argues that to the extent the plaintiffs are relying on the *Hardwicke* exception identified by the Circuit in footnote 14 of the *St. Bernard Parish* decision to argue that a different rule should apply because the government's risk increasing actions in this case came after the flood

reducing actions, that argument is without merit. The government argues that the

discussion in *Hardwicke* plaintiffs rely on was only *dicta* in *Hardwicke* and thus is not

binding. The government argues that the test established in *St. Bernard Parish* by the

Circuit is binding and that under its "but for" test the plaintiffs' entire case must be

dismissed.

There is no question that the Circuit's decision in *St. Bernard Parish* is an

intervening change in controlling law that requires the court to re-examine its opinion

regarding causation. In *St. Bernard Parish* the Circuit made clear, that if the government

actions the plaintiffs claim have caused a taking by increasing flooding on their property

are "related" to other government actions that have reduced flooding on plaintiffs'

properties, the government's flood reduction actions must be eliminated together with the

flood increasing actions in the "but for" world comparison. The court does not find the

plaintiffs' argument on reconsideration that the government's flood increasing actions in

this case are not directly related to the government's flood decreasing actions to be

supported by the trial record. The evidence established that the Corps' System and River

Changes were taken in direct response to the Corps' flood control actions on the Missouri

River and that the Corps took care to consider the impact of the River and System

Changes on the Corps' flood reduction actions in designing and implementing those

actions to avoid or minimize adverse flooding consequences. *Ideker*, 136 Fed. Cl. at 705

("The court does not question the Corps' efforts to minimize flooding in constructing and

maintaining SWH and ESH [River and System Changes].")

*St. Bernard Parish* requires the court to consider all government actions "directed to the same risk that is alleged to have caused the injury to plaintiffs." 887 F.3d at 1365. The Circuit did not say that the government actions must serve the same flood control purpose or that the actions must be near in time. To the contrary, the Circuit recognized that the MRGO project at issue in *St. Bernard Parish* was a threat to the flood protection provided by the levees because of concerns regarding MRGO. *Id*. As the Circuit explained, "[w]hen the government takes actions directly related to preventing the same type of injury on the same property where the damage occurred, such action must be taken into account even if the two actions were not the result of the same project." *Id.* at 1366. For this reason, the court finds the Circuit's reliance on *Hardwicke* in the text of *St. Bernard Parish* unpersuasive.

Here, as in *St. Bernard Parish*, the government built the Missouri River System to provide, among other purposes, significant flood control to plaintiffs and the evidence established that the Corps continues to provide significant flood protection to plaintiffs even after the implementation of the MRRP. Thus, to prove causation the plaintiffs needed to consider a "but for" world without any of the Missouri River System protections or Corps' flood decreasing actions together and without any of the Corps' post-2004 flood increasing actions. The plaintiffs did not make this case. Accordingly, unless the court finds that the potential *Hardwicke* exception argued in plaintiffs'

16

reconsideration briefs and discussed in footnote 14 of the *St. Bernard Parish* opinion applies, plaintiffs' motion for reconsideration must be denied.[4]

The court understands that the plaintiffs contend on reconsideration that the *Hardwicke* exception requires the inclusion of the Missouri River protection in the "but for" world.  As such, plaintiffs claim that they established at trial that if the Corps had followed the 1979 Manual it could have lessened the flooding the plaintiffs experienced in 2011. They argue that the Corps' flood increasing actions came after the Corps' flood reducing actions and that until 2004 no one contemplated that the Corps' would change its flood protection priority approach. Pls.' Resp. at 8-9 (ECF No. 440).

Additionally, in their motion for reconsideration the plaintiffs argue that the court's factual findings regarding the cause of flooding in 2011 are clearly erroneous because the court failed to consider how flooding in 2011 was caused by the System and River Changes after 2004. Plaintiffs argue that the court clearly erred in concluding that the releases in 2011 were not the result of the post-2004 System Changes.  According to plaintiffs, had the court properly understood plaintiffs' claim and evidence it would have found that the Corps' System and River Changes, which occurred after the Corps' actions

---

[4] The plaintiffs argue that if the court finds that plaintiffs needed to take the Missouri River System protections into account to establish causation then there could never be a taking by the government for any flooding on the Missouri River in the areas protected by the System and this would create an exception to a taking by flooding which was expressly rejected by the Supreme Court in *Ark. Game*, 568 U.S. at 31-32. The court has considered this contention and finds that it does not have to reach this issue because, for the reasons discussed above, the court finds that the *Hardwicke* exception discussed by the Circuit in footnote 14 is potentially applicable in circumstances like those presented in the pending case.

to decrease flooding, were the cause of the 2011 flood and that they prevail under the *Hardwicke* exception.

The government argues as discussed above that the *Hardwicke* exception should not be adopted by the court but that even if it were adopted by the court the plaintiffs have still failed to meet their burden of proof on the issue of causation for the 2011 flood. The government argues that the court did not misunderstand the basis for plaintiffs' causation analysis for 2011. Rather, as discussed above, the government argues that plaintiffs relied at trial, as they do now, on evidence to show that the changes the Corps had to make to its Master Manual to implement the MRRP caused the flooding. As discussed, plaintiffs presented evidence to show that flooding would not have occurred had the Corps maintained the approach it followed for large inflows into the System Reservoirs under the 1979 Master Manual based on a comparison of the inflows in 2011 with the inflows in 1997.  *Ideker*, 136 Fed. Cl. at 654, 693. As discussed, plaintiffs' expert Dr. Christensen compared what happened using the new Master Manual with what would have happened if the Corps had used the 1979 Master Manual based on the 1997 inflows to the reservoirs. The government explains that the court's factual findings rejecting Dr. Christensen's opinion are supported by the evidence and should not be reconsidered.

The court agrees with the government, assuming that the *Hardwicke* exception outlined in *St. Bernard Parish* applies to this case with regard to the 2011 flood, that the plaintiffs have not established a basis for reconsideration.  The plaintiffs have rehashed the same evidence and same expert theories the court considered and rejected at trial.

They have not presented any new evidence or identified any clear error in the court's essential finding that unprecedented and unforeseeable inflows to the System in 2011 were the cause of the 2011 flood and that the Corps' alleged change in priorities or need to maintain larger volumes in the reservoirs for species protection did not cause the 2011 flooding.

In view of the foregoing, even if the *Hardwicke* exception applies, the plaintiffs cannot prevail on reconsideration.[5] The court determined based on the evidence presented at trial that plaintiffs had not met their causation burden. Plaintiffs have not shown how the court's findings are clearly wrong.[6] Moreover, to the extent the plaintiffs continue to question the Corps' decision not to act earlier and to release more water

---

[5] Implicit in the court's findings regarding the cause of the flooding in 2011 was the court's conclusion that under both the Corps' 1979 Master Manual and 2004 Master Manual that extreme releases from the dams that would result in flooding were "contemplated" in the event the System Reservoirs could not hold the amount of inflow and the System was threatened. *Ideker*, 136 Fed. Cl. at 692. For this reason as well, plaintiffs' reliance on the *Hardwicke* exception fails. In the circumstances of 2011, such releases were contemplated. This response by the Corps was contemplated when the System was designed, as reflected in the 1979 and earlier Master Manuals. Thus, the 2011 flood does not meet the criteria for the *Hardwicke* exception.

[6] The court also finds that separate and apart from the failings of their causation argument, plaintiffs have also failed to meet the standards of reconsideration with regard to their objections to the court's foreseeability findings for the 2011 flood. The plaintiffs argue that the court erred in looking at foreseeability in 2011 as opposed to 2004 when the Corps began to implement the MRRP. The plaintiffs argue that in 2004 and in planning the MRRP the Corps knew that it was potentially increasing the risk of flooding as a direct consequences of its actions. The court rejected this contention on the grounds as discussed above that the extreme flooding in 2011 was caused by the Corps making extreme releases to save the System. The court determined that the excessive inflows in 2011 could not have been foreseen by the Corps and indeed they would not have made any difference because as discussed above the court determined that the plaintiffs had failed to prove that the Corps' actions in response to the extreme inflows in 2011 would have been different had it been following the 1979 Manual. Put another way, having failed to establish the cause of the flooding was the MRRP, the plaintiffs could not prove how the 2011 flooding was foreseeable. The Corps' extreme measures to address extreme inflows however, were contemplated and were not changed by the Corps' post-2004 System and River Changes.

earlier in the year under the 1979 Master Manual, that challenge is not grounds for reconsideration.  The plaintiffs' contentions regarding the Corps' failure to release water sooner from the System reservoirs is a challenge to government inaction and sounds in tort, regardless of whether it was pled as a tort. The Circuit in *St. Bernard Parish* had made clear that the government's failure to act cannot support a taking claim. *St. Bernard Parish,* 887 F.3d at 1362.

For all of these reasons, the plaintiffs' motion for reconsideration is **DENIED**.

## B.      The Government's Motion for Reconsideration Is Denied

The government argues that under the standards for causation set in *St. Bernard Parish,* the court's causation finding in favor of certain plaintiffs in connection with flooding in 2007, 2008, 2010, 2013, and 2014 must be set aside.  Specifically, the government argues that the claims of the plaintiffs who established causation and foreseeability in Phase I must be dismissed because those plaintiffs failed to prove the flooding they experienced in those years would not have occurred without the Missouri River System and the flood reduction actions for those same years. The government contends that the plaintiffs in this case, like the plaintiffs in *St. Bernard Parish*, can only establish causation for flooding in the years in question if they can show that the flooding that occurred in those years would not have occurred had the government not constructed the Missouri River flood control system.

There is no serious question that the plaintiffs did not present evidence to make that comparison. In response to the government's motion, the plaintiffs argue they do not have to meet the causation standard laid out by the government.  The plaintiffs, again

20

relying on the language in *St. Bernard Parish* regarding *Hardwicke,* argue that there is no nexus between the government's flood reducing actions and the government's flood increasing actions. They also argue that the *Hardwicke* exception to the causation test discussed in footnote 14 of the *St. Bernard Parish* decision should apply for plaintiffs to establish causation for the years in question.

The plaintiffs argue that because the Corps has taken flood risk-increasing actions that were not contemplated when the Missouri River System was created that this is precisely the situation the Circuit contemplated when it cited *Hardwicke* in the text of its decision and certainly when it noted the *Hardwicke* exception in footnote 14. Specifically, plaintiffs argue that they established , as discussed in the court's decision, that the Corps' actions in destroying structures designed to keep the Missouri River straight and self-scouring has increased flooding on the River for the purpose of increasing habitat for threatened and endangered species and that these actions together with the Corps' decision to intentionally allow these same structures to deteriorate have made the River more likely to flood onto land or block drainage or cause seepage during periods of high River flow. The plaintiffs also argue that they have proven that the Corps' releases from the dams for the benefit of endangered and threatened species have led to more flooding. Returning the River to its natural state, plaintiffs contend, is not related to or has no nexus with the Missouri River System built primarily for flood control in the 1940s through 1960s.  The plaintiffs further argue that returning the River to a more natural state was certainly not contemplated when the Missouri River System was created. For these reasons, plaintiffs argue that the proper "but for" world comparison for

the years at issue is, as the court found, between the world before the Corps was required to make the System and River Changes at issue in this case and the world after the Corps began to make the System and River Changes post- 2004.

As noted above, with regard to 2011, the government argues that the Corps' System and River Changes are directly related to each other and thus plaintiffs cannot prevail on a theory that there is no nexus between the government's flood reducing actions and flood increasing actions. The government also argues, as discussed above, that the court should not adopt an exemption in line with the dicta expressed in *John Hardwicke* for the alleged flooding that occurred in 2007, 2008, 2010, 2013, and 2014.

Whether plaintiffs have established causation for flooding in 2007, 2008, 2010, 2013, and 2014, based on the comparison made between the River under the 1979 Master Manual and the new Master Manuals and MRRP, presents a close question following the Circuit's decision in *St. Bernard Parish.* The court finds that while the flood decreasing actions and flood increasing actions are related for purposes of *St. Bernard Parish* for the same reasons as discussed above with regard to the 2011 flood that plaintiffs in this case should be able to avail themselves of the exception identified by the Circuit in footnote 14 regarding *Hardwick.* The parties have not identified, and the court has not found, any flooding case identical to the present case. In this case, for the first time, plaintiffs claim that they are experiencing more flooding and more severe flooding because of actions the Corps has taken and is continuing to take below Gavins Point Dam to return the River to its more natural state to prevent jeopardizing threatened and endangered species and to improve and create habitat. Although the Corps has always had multiple obligations

22

under the federal statutes governing operations of the Missouri River System, including fish and wildlife protection, it was not until 2004 and a court order mandating that the Corps give priority to threatened and endangered species that the Corps began to take a series of very specific actions within the River and in its System releases to accomplish that legal requirement. *Ideker*, 136 Fed. Cl. 668-69. The court found that these actions have in fact increased the risk of flooding along the River. *Id.* at 689.

The court's findings of fact establish that the changes made to the Corps' River and Mainstem system after the court order requiring the Corps' compliance with the ESA increased flooding to a degree that would not have been contemplated when the River and Mainstem System structures were planned. *Id.* at 690. This is not to say that the Corps did not have fish and wildlife protection on its list of statutory obligations. Rather, as the court found, the Corps' actions designed to return the Missouri River to a more natural state was outside the contemplation of the Corps. In this circumstance, a comparison between the "but for" world before the Corps began to undertake significant actions to return the River to a more natural state in 2004 and the current post-2004 world is the appropriate comparison under the *Hardwick* exception identified in *St. Bernard Parish* in footnote 14. Because that was the comparison the court considered to determine causation for the representative plaintiffs for the years of flooding challenged by the government in its motion for reconsideration, the government's motion for reconsideration is **DENIED**.

Although the court has denied the government's motion for reconsideration, as the court has previously held, the court has left for Phase II whether the off-setting benefits

from the Corps' flood control actions must be considered in determining whether there has been a taking and if so whether there has been a taking for any of the years in question. Specifically, the court has left for Phase II whether the Supreme Court's holding in *Sponenbarger* would preclude the court from finding that there has been a taking of any of the plaintiffs' properties where the government's actions inflicted "slight damage" as compared to the benefits plaintiffs have received from the government's flood control efforts on the Missouri River as a whole.[7]

## CONCLUSION

For the above-stated reasons the plaintiffs' and the government's motions for reconsideration are **DENIED**.[8]  The parties shall have until March 22, 2019, to propose a schedule for resolving the remaining issues in this litigation.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge

---

[7] This analysis would also include the construction of federal levees and federally-funded levees.

[8] The court **GRANTS** the parties joint request (ECF Nos. 429 and 430) to move Merrill Sargent. Deceased, and Ron and Dale Sargent one of the plaintiffs from group two (plaintiffs that established causation and foreseeability) to group one (plaintiffs that established causation, foreseeability, and severity) for Phase II. Accordingly, the court finds that Merrill Sargent. Deceased, and Ron and Dale Sargent have shown causation, foreseeability and severity for flooding in 2008, 2010, and 2014.