# In the United States Court of Federal Claims

No. 14-183L
(Filed: January 9, 2020)

|  |  |  |
|---|---|---|
| | ) | |
| IDEKER FARMS, INC., et al., | ) | Motion to Amend Answer, RCFC 15; |
| | ) | Taking; Fifth Amendment; Affirmative |
| Plaintiffs, | ) | Defense; *Sponenbarger*; Relative |
| | ) | Benefits; Futility; Flooding |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*R. Dan Boulware*, St. Joseph, MO, for plaintiffs.  *Edwin H. Smith*, *Seth C. Wright*, and, *R. Todd Ehlert*, St. Joseph, MO, and *Benjamin D. Brown* and *Laura Alexander*, Washington, D.C., of counsel.

*Terry M. Petrie*, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., with whom was *Jeane E. Williams*, Deputy Assistant Attorney General, for defendant.  *Jacqueline C. Brown*, *Brent Allen, Elizabeth McGurk,* and *Brad Leneis*, Washington, D.C., of counsel.

## ORDER DENYING MOTION TO AMEND ANSWER ON THE GROUNDS REQUESTED

**FIRESTONE**, *Senior Judge*

Pending before the court is the United States' motion to amend its answer following the Phase I trial on causation and related liability issues in the above-captioned case. In the Phase I decision, *Ideker Farms, Inc. v. United States*, 136 Fed. Cl. 654 (2018), and in the decision on reconsideration, *Ideker Farms, Inc. v. United States*, 142 Fed. Cl. 222 (2019), the court determined that the United States had caused flooding on

some, but not all, of the representative plaintiffs' properties in connection with actions taken by the United States Army Corps of Engineers ("Corps") under the Missouri River Recovery Program ("MRRP"). Specifically, the court determined that the MRRP, which is designed to return the Missouri River to a more natural state, led to greater flooding on plaintiffs' properties than had existed before the MRRP started in 2004.[1] Based on the evidence presented and as explained in the decision on reconsideration, the court concluded that the United States could be liable for a taking based on the changes the Corps has made and is continuing to make under the MRRP to meet its obligations under the Endangered Species Act ("ESA"), 16 U.S.C. § 1536.

The parties are now preparing for the Phase II trial to resolve any remaining liability issues and to determine what just compensation, if any, is due for the taking of a temporary or permanent flowage easement on the properties owned or leased by the representative plaintiffs selected for Phase II. *See*, *e.g.*, Disc. Sch. And Scope of Disc. For Phase II Order, May 16, 2019 (ECF No. 479).[2]

The government filed its November 5, 2019 motion to amend its answer under Rule 15(a) of the Rules of the United States Court of Federal Claims ("RCFC") pursuant

---

[1] As discussed at length in the court's causation decision, under the MRRP, the Corps has made changes "to its operation of the Mainstem Reservoir and Dam System, . . . and . . . to the [Missouri River Bank Stabilization and Navigation Project] . . . to meet its ESA obligations under the 2003 [Biological Opinion]." *Ideker Farms*, 136 Fed. Cl. at 667-68.

[2] In the Phase I trial as discussed below the court heard testimony regarding flooding on 44 properties owned by 44 of the 340 plaintiffs in the case. The parties have now identified 3 of those plaintiffs to serve as representative plaintiffs in the Phase II trial.

to the court's scheduling order. Final Disc. Sch. And Prelim. Pre-Trial Order, Oct. 17, 2019 (ECF No. 509); Def.'s Mot. to Amend Answer ("Def.'s Mot.") (ECF No. 513). In its proposed amendment to its answer, the government seeks to include a liability-related defense based on the "relative benefits" doctrine set forth in *United States v. Sponenbarger*, 308 U.S. 256 (1939). Def.'s Mot., Attach. 4 (ECF No. 513-4). In *Sponenbarger*, 308 U.S. at 266-67, the Supreme Court held that "if governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty." If the amendment is allowed, the government will seek to show that the United States cannot be found liable for a taking in connection with the implementation of the MRRP because the government can show that any flooding impact from the MRRP is "slight" in comparison to all of the flood protection plaintiffs have received by virtue of the Corps' operation of the Missouri River Mainstem System ("Mainstem System") and the Missouri River Bank Stabilization and Navigation Project ("BSNP"). Def.'s Reply at 20 (ECF No. 526).

The government argues that under its reading of *Sponenbarger* the court must weigh the relative benefits the plaintiffs received from all of the Corps' actions on the Missouri River separate from the court's causation analysis, and in weighing the benefits the court must consider the construction and maintenance of the Mainstem System and the BSNP in deciding whether the flooding caused by the MRRP is "slight" in comparison to what plaintiffs would experience without the Mainstem System of

3

Reservoirs and Dams and the BSNP to determine whether the government is liable for a taking.

The plaintiffs oppose the government's motion to amend its answer on a variety of grounds. The plaintiffs claim that the motion is untimely and prejudicial. Pl.'s Opp. at 9 (ECF No. 517). They also argue that the motion is futile because the government's proposed application of *Sponenbarger* to the facts of this case is not supported. Pl.'s Opp. at 13. The plaintiffs argue that the government's reading of *Sponenbarger* is too broad where, as here, the changes to the Mainstem System and the BSNP required together with other actions under the MRRP were not contemplated at the time the Mainstem System and the BSNP were constructed.

Specifically, the plaintiffs argue that because the MRRP is aimed at returning the Missouri River to a more natural state to meet the Corps' obligations under the ESA, the MRRP may not be considered together with the Corps' flood control actions on the Missouri River to determine the government's liability for a taking under the Fifth Amendment. Pl.'s Opp. at 25. In this connection, the plaintiffs concede that the benefits they have received from the construction and maintenance of the Mainstem System and the BSNP have been enormous. Indeed, much of the property at issue in this case is former Missouri River bottom land created by accretion from construction of the BSNP. They argue, however, that in deciding whether the MRRP has resulted in the taking of flowage easements without compensation in contravention of the Fifth Amendment, the

flooding impact from the MRRP must be evaluated separately from the flood protection provided by the Corps' Mainstem System and BSNP.

The plaintiffs argue that *Sponenbarger* does not require a comparison of flooding on plaintiffs' properties in a "but for" world without the Mainstem System and the BSNP as the government proposes. Instead, the plaintiffs argue that the Mainstem System and the BSNP are the baseline against which the court should determine if the MRRP has resulted in a taking of a flowage easement on plaintiffs' properties. Moreover, the plaintiffs argue that this court's causation decision and its reconsideration decision by their terms necessarily require the Mainstem System and BSNP to serve as a baseline against which the MRRP flood impacts must be weighed. Plaintiffs contend that the court has already correctly determined that the proper comparison for deciding taking liability in this case is the world with the MRRP and the "but for" world without the MRRP only.

The government responds that plaintiffs' reading of *Sponenbarger* is too narrow and that the court must consider the flooding of plaintiffs' properties caused by the Corps' actions implementing the MRRP in the context of the enormous flood reduction benefits the plaintiffs have received from the Corps' construction and maintenance of the Mainstem System and the BSNP. The government further argues that the court previously reserved this issue for the next trial phase and thus the defense is neither untimely nor prejudicial.

For the reasons that follow, the government's motion to amend its answer to include a defense based on its reading of *Sponenbarger* is **DENIED**. The court has

determined that the flood protection provided by the Mainstem System and the BSNP is the baseline of flood protection against which the additional flooding caused by the MRRP should be judged for purposes of deciding both causation and government liability for any taking in this case.

To the extent the government seeks to show in the Phase II trial that the Corps has taken, post-2014, specific flood risk-reducing actions aimed at addressing the increase in flood risk associated with the Corps' MRRP activities, the court will allow the government to introduce such evidence for the purposes of deciding the severity (if still relevant), duration, and type of taking (temporary or permanent) for the representative plaintiffs.

## I.     PROCEDURAL HISTORY

Following a 55 day trial, evaluating the taking claims of 44 representative plaintiffs for various years from 2007-2014, the court issued a 103-page trial opinion on February 23, 2018. In the court's opinion, the court evaluated whether the System and River Changes the Corps began to implement in 2004 under the MRRP caused flooding or increased flooding on plaintiffs' properties for the years 2007, 2008, 2010, 2011, 2013, and 2014.[3]  In evaluating causation, the court reviewed the extensive history of the

---

[3] These included changes to the Corps' management of the dams which required the Corps to release water from the dams during periods of high water below the dams for the protection of threatened and endangered species ("System Changes"). *Ideker Farms*, 136 Fed. Cl. at 668-69. It also included various projects to dismantle dikes and revetments along the shoreline and to build chutes and to widen the River channel in order "to restore the River to a more natural state," which had historically meandered miles inland ("River Changes"). *Id.* at 669. Specifically, as of 2014 the Corps "had undertaken 1,697 dike notching actions, 354 major modification actions, 63 dike lowering actions, 36 dike extension actions, 39 side-channel chute actions, 20 revetment chute actions, 14 backwater actions, and 3 channel widening actions." *Id.* at 702. The Corps also

Corps' actions in reengineering the Missouri River by creating the nation's largest reservoir and dam system and in straightening the River with dikes and revetments to ensure that downstream of the dams the River ran faster and deeper from when the River meandered across a large flood plain. The court also recognized that much of the property at issue in the litigation was created because of the Mainstem System and the BSNP. The court then examined the Corps' efforts to address the impact reengineering the River had on the natural environment, including threatened and endangered species and their habitat, and concluded based on the evidence presented that the MRRP, which was established to address these effects, gave rise to significant changes to the Corps' management of the Missouri River; changes that had not been contemplated when the Mainstem System or the BSNP were created. *See Ideker Farms*, 136 Fed. Cl. at 668; *Id.* at 686; *Ideker Farms*, 142 Fed. Cl. at 225.

The court found that in deciding whether the actions taken to implement the MRRP had caused flooding, the Mainstem System and the BSNP had to be viewed as the baseline. Thus, in analyzing causation, the court found that the proper comparison was the world with the MRRP and a "but for" world without the MRRP. *See Ideker Farms*, 136 Fed. Cl. at 690.

---

constructed shallow water habitat and emergent sandbar habitat for threatened and endangered species. *Id.* at 694; *see id.* at 701 (explaining that shallow water habitat is made by "notching dikes and revetments, allowing the same to deteriorate, dredging chutes, and creating backwaters and chevrons").

Based on evidence presented by the parties, the court concluded that the changes taken by the Corps under the MRRP had caused water surface elevations to rise which in turn increased flooding on certain of plaintiffs' properties for the years 2007, 2008, 2010, 2013, and 2014. *Id.* at 690. Specifically, the court found that the changes called for under the MRRP have led "to more flooding or more severe or longer flooding than would have occurred had these Changes not been made by the Corps." *Id.* at 696-97. In this connection, the court found that "[s]eepage and blocked drainage claims . . . are all tied to higher [water surface elevations]." *Id.* at 720. The court concluded that, for certain properties, the flooding that occurred in 2007, 2008, 2010, 2013, and 2014, was both caused by the Corps' MRRP and was the foreseeable result of implementation of the System and River Changes under the MRRP. *Id.* The court further found that the evidence presented by the government to show that the MRRP had no impact or a positive impact on flood control was not supported and thus was unpersuasive. *Id.* at 709, 711.

Based on the court's evaluation of the evidence, the court found that 28 plaintiffs had established causation and could proceed to Phase II of the trial. The remaining representative plaintiffs would be dismissed from the case. Specifically, the court found that 14 plaintiffs had demonstrated that flooding on their property was the foreseeable result of the Corps' MRRP activities but the court left open the question of whether that the flooding was sufficiently severe to establish a taking. *Id.* at 762. The court found an additional 14 plaintiffs had established that the Corps' MRRP activities were the

foreseeable cause of the flooding on their properties and of sufficient severity to give rise

to a taking assuming all of the remaining factors for liability set by the Supreme Court in

*Arkansas Game & Fish Commission v. United States*, i.e. duration and the owner's

reasonable investment-backed expectations, were met. *Id.* at 762; *see Ark. Game & Fish*

*Comm'n v. United States*, 568 U.S. 23, 38-39 (2012).

Both parties moved for reconsideration of the court's Phase I decision. While their

motions were pending, the Federal Circuit issued its decision in *St. Bernard Parish*

*Government v. United States*, 887 F.3d 1354 (Fed. Cir. 2018), finding that the

government was not liable for certain flooding claims associated with Hurricane Katrina

in New Orleans. In this case, the court concluded on reconsideration that the holdings in

*St. Bernard Parish* were consistent with the court's Phase I decision and that

reconsideration was not warranted for any of the other reasons presented to the court. *See*

*Ideker Farms*, 142 Fed. Cl. at 228.

In reaching this conclusion, the court specifically rejected the government's

contention that the court erred in failing to consider all of the Corps' flood risk-reducing

actions together with the MRRP in deciding causation. The court determined that where

the changes to the Corps' management of the River required by the MRRP had not been

contemplated at the time the Corps had designed and constructed the reservoirs and dams

that make up the Mainstem System or the BSNP, that those flood risk-reducing actions

serve as a proper baseline in deciding whether later Corps' actions have caused increased

flooding. The court found that this case fit squarely within the exception identified in

footnote 14 of *St. Bernard Parish* opinion where the Federal Circuit clarified that it was not addressing the situation where "the risk-reducing government action preceded the risk-increasing action." 887 F.3d at 1367 n.14 (citing *John B. Hardwicke Co. v. United States*, 467 F.2d 488, 490-91 (Ct. Cl. 1972)). Under this exception, known as the *Hardwicke* exception, a risk-reducing action that precedes a risk-increasing action would only be considered if the risk-increasing action – here, the MRRP – was contemplated at the time of the risk-reducing action – here the Mainstem System and the BSNP. *See id.; see also Ideker Farms*, 142 Fed. Cl. at 228-232.

Following several status conferences regarding the scope of the Phase II trial, the government on November 5, 2019, filed its formal motion to amend its answer to include an affirmative defense based on *Sponenbarger*. The motion was fully briefed on December 9, 2019. The court held oral argument on December 10, 2019.

## II.   LEGAL STANDARD

RCFC 15(a)(2) states that "a party may amend its pleading only with the opposing party's written consent or with the court's leave" and that "[t]he court should freely give leave when justice so requires." In general, the court should only deny leave to amend where there is evidence of "delay, bad faith, repeated failure to correct . . ., undue prejudice to the opposing party, or if the amendment would be futile." *Marchena v. United States*, 128 Fed. Cl. 326, 330 (2016), *aff'd*, 702 F. App'x 988 (Fed. Cir. 2017) (citing *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1158 (Fed. Cir. 2014)); *see Foman v. Davis*, 371 U.S. 178, 182 (1962) (giving discretion to the trial court to deny a motion to amend for reasons "such as undue delay, bad faith . . . futility of amendment,

etc."). Where the defendant seeks to amend an answer to raise an additional affirmative defense, that defense "may nevertheless be raised where the plaintiff was aware of the argument and indicated his responses to the evidence." *E.L. Hamm & Assocs., Inc. v. England*, 26 F. App'x 936, 937 (Fed. Cir. 2002). "The decision to grant or deny a motion for leave to amend . . . lies within the sound discretion of the trial court." *Tamerlane, Ltd. v. United States*, 550 F.3d 1135, 1147 (Fed. Cir. 2008) (quoting *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1372 (Fed. Cir. 2004)).

## III.   DISCUSSION

Given the court's prior order stating that issues associated with *Sponenbarger* would be considered in the Phase II trial,[4] the court agrees with the government that its motion to amend its answer is not untimely nor would allowing the amendment be prejudicial. "Undue prejudice may be found when an amended pleading would cause unfair surprise to the opposing party, unreasonably broaden the issues, or require additional discovery." *Cooke v. United States*, 79 Fed. Cl. 741, 743-44 (2007). The

---

[4] After the initial filing of the complaint in 2014, the parties submitted a Joint Preliminary Status Report which listed the relevant benefits doctrine as one of the relevant legal questions for this case. J. Prelim. Status R. at 5 ¶ 10 (ECF No. 13) ("Whether the government's operation of the Missouri River Mainstem system, taken as a whole, confers net benefits upon Plaintiffs' specific parcels of property."). Following the pre-trial conference, the court, relying on language in *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2434-35 (2015) (Breyer, J. concurring), issued an order stating "[t]he court will determine the relevance of *United States v. Sponenbarger*, 308 U.S. 256, 266-67 (1939), if any, if the court is required to determine just compensation after finding that a taking has occurred." Oct. 4, 2016 Order at 1 (ECF No. 146). The government then moved to allow presentation of evidence regarding relative benefits as an element of liability. Def.'s Mot. to Modify Pre-Trial Order § II.B (ECF No. 154). The court then held a hearing and determined that "if, in fact, the Plaintiff is able to establish causation and foreseeability, we will have a second phase of the trial that will deal with the *Sponenbarger* issue and reasonable investment-backed expectations. . . ." Tr. of Nov. 2, 2016 Hr'g at 6:23-7:2.

plaintiffs have had substantial notice that the government will assert a defense based on relative benefits. Indeed, in the reconsideration decision, the court explicitly stated that it had reserved the application of *Sponenbarger* to the facts for Phase II. *Ideker Farms*, 142 Fed. Cl. at 232-33. Thus, whether the motion to amend should be granted turns on whether the government's *Sponenbarger* defense as presented would be futile.

"An amendment is futile when the proponent of the amendment cannot provide a colorable argument that the original or the amended claim will not survive a motion to dismiss." *Northrop Grumman Sys. Corp. v. United States*, 137 Fed. Cl. 677, 682 (2018) (citing *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1333 (Fed. Cir. 2000)). To survive the motion to dismiss standard, the government must have alleged sufficient facts such that the defense is not "destined to fail." *Hanover Ins. Co. v. United States*, 134 Fed. Cl. 51, 63 (2017).

As discussed above, the government argues that under *Sponenbarger* and the relative benefits doctrine it established, the court's determination of whether there has been a taking "should consider *all* benefits from the relevant government actions that affect the Plaintiffs' properties." Def.'s Reply at 9. The government argues that these include "those arising from the construction, operation, and repair of the dams, BSNP river-training structures such as dikes and revetments, and hundreds of miles of levees." *Id.* at 10. Indeed, the government contends that this case is easily resolved under the relative benefits doctrine alone because the intermittent but repeated flooding on a portion of plaintiffs' property due to the MRRP is without question "slight" in

comparison to the enormous benefits the plaintiffs received from the Corps' construction and maintenance of the Mainstem System and the BSNP structures which created plaintiffs' river-bottom property and for years protected their properties from flooding. *See* Tr. of Dec. 10, 2019 Oral Arg. 14:5-10.

The government acknowledges that the court's Phase I decision "limited the causation analysis" to a "but for analysis" comparing flooding on plaintiffs' properties before and after implementation of the MRRP for each of the years in question. Def.'s Reply at 13. The government argues, however, that the relative benefits analysis required by *Sponenbarger* is distinct from the causation analysis and that under *Sponenbarger* the court, in deciding whether the government is liable for a taking based on flooding associated with a government project, must take into account "all benefits of the relevant government actions without limitation." *Id*; *see also* Tr. of Dec. 10, 2019 Oral Arg. 47:15-17. Relying on this reading of *Sponenbarger*, the government argues that the court must compare the flooding the plaintiffs experienced with the MRRP with the flooding they would experience without the Mainstem System and the BSNP to find liability for a taking.

The plaintiffs argue that, having concluded that the "but for" world for purposes of deciding causation included the Mainstem System together with the BSNP as the baseline, the court should not apply a different analysis for purposes of determining the government's taking liability for that same flooding. According to the plaintiffs, the law of the case following the reconsideration decision is that the Mainstem System and the

BSNP fit within the *Hardwicke* exception identified by the Federal Circuit in *St. Bernard Parish* footnote 14 and, in keeping with that exception, the government can be held liable for a taking with the existing flood protections serving as the baseline if the flood risk-increasing activities were not contemplated at the time the flood protections were put in place. Pl.'s Sur-Reply at 4 (ECF No. 527) (citing *Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014)). The plaintiffs also take issue with the government's reading of *Sponenbarger* and argue that the Supreme Court in *Sponenbarger* accepted the flood protection levees the government had previously helped to construct as a baseline and only considered the government's actions in connection with the precise project at issue in deciding relative benefits. Pl.'s Opp. at 16.

### A. The Law Of The Case Compares A World With And Without The MRRP Only

To begin, it is not disputed that the court has already determined that the "but for" world for deciding whether the government caused the flooding on plaintiffs' properties is a "but for" world without the MRRP but with the rest of the Mainstem System and the BSNP in place. Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Banks*, 741 F.3d at 1276 (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988)). The law of the case doctrine "bars retrial of issues that were previously resolved." *Intergraph Corp. v. Intel Corp*., 253 F.3d 695, 697 (Fed. Cir. 2001). "Although a court may depart from the law of the case doctrine in 'exceptional cases,' such departures are rare" and generally require discovery of new and

material evidence or an intervening change in controlling legal authority. *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1336 (Fed. Cir. 2004) (citations omitted).

The court finds that under the law of the case doctrine, the court's conclusion that the baseline for determining causation must also apply to deciding the government's ultimate liability for a taking. The government's suggestion that in deciding whether the government is liable for a taking the court should compare the flooding on plaintiffs' properties caused by the MRRP with the flooding that would have occurred on plaintiffs' properties without the Mainstem System and the BSNP is inconsistent with the court's reconsideration decision.

The court rejected on reconsideration the government's contention that under the Federal Circuit's opinion in *St. Bernard Parish* the "but for" world for deciding causation for a taking by government flooding mandates consideration of all of the benefits plaintiffs received from the Mainstem System and the BSNP. While the court on reconsideration acknowledged that the MRRP is related to the Mainstem System and the BSNP, the court did not find that they must therefore be considered together for purposes of deciding whether the government's actions give rise to a taking. To the contrary, as the court discussed in the reconsideration opinion, *St. Bernard Parish* leaves open the exact circumstances of this case where the flooding at issue is caused by government actions that were plainly not contemplated at the time the original river flood control

management systems were designed and constructed. *Ideker*, 142 Fed. Cl. at 232.[5] In

such circumstances, the flood protections previously provided by the government are the

baseline for deciding taking liability.

B.   ***Sponenbarger* And Subsequent Cases From The Federal Circuit Are Consistent With The Court's Reconsideration Decision**

The court also finds that even if the relative benefits issue had not been resolved in

the court's reconsideration opinion, the government's reading of *Sponenbarger* is too

broad. As plaintiffs persuasively point out, in *Sponenbarger* the Court in deciding the

government's taking liability "did *not* compare the injuries allegedly inflicted by the 10-

year program in question to the flood-control benefits . . . that had been conferred by

other federal programs that preceded it." Pl.'s Opp. at 16. In *Sponenbarger*, an individual

sued the United States for a taking of her land caused by the Mississippi Flood Control

Act of 1928 and actions pursuant to the Act. 308 U.S. at 260. In deciding whether the

government was liable for a taking, the Court did not consider the flood control benefits

that had been conferred on the plaintiff's land under prior flood control programs paid for

---

[5] In *St. Bernard Parish*, the plaintiffs alleged the government's operation of the Mississippi River-Gulf Outlet ("MRGO") channel during the aftermath of Hurricane Katrina resulted in flooding that would not have occurred had the channel not been constructed. 887 F.3d at 1357. At the time when construction of the MRGO was concluding, the Lake Pontchartrain and Vicinity Hurricane Protection ("LPV project") began construction. *Id.* at 1358. The Circuit stated that to show causation, the plaintiffs had to show that their property would be worse in a "but for" world without both the MRGO and LPV than in the present world with both. *Id.* at 1365. The Circuit explained that both must be considered because both were "directed to the same risk that is alleged to have caused the injury to the plaintiffs." *Id.* In *St. Bernard Parish*, the Circuit stated that "there is no question that the LPV project was directed to decreasing the very flood risk that the plaintiffs allege was increased by the MRGO project" and included "levees along the banks of MRGO." *Id.* Indeed, some "construction of the levees used some of the material dredged from MRGO." *Id.* The facts of this case are very different.

by the United States. Specifically, the Court acknowledged that the United States had helped build protective levees along the banks of the Mississippi River. *Id.* at 261. However, in deciding whether the government was liable for a taking based on the Mississippi Flood Control Act of 1928, the court looked only at the benefits conferred by that 1928 Act and not any additional flood control benefits conferred on the plaintiff's land from the government's earlier support of an extensive levee system. The Supreme Court found that "[t]he Government ha[d] not subjected respondent's land to any additional flooding, above what would occur if the Government had not acted [in 1928]." *Id.* at 266.

Thus, *Sponenbarger* does not mandate that this court look to every flood control benefit the government has conferred on a plaintiff in deciding whether there has been a taking. The Supreme Court acknowledged that there was an existing baseline of protection and looked only at whether the flooding caused by the 1928 Act was outweighed by the benefits conferred on plaintiff by that same Act. Here, by analogy, the court's inquiry was properly focused on whether the flooding caused by the MRRP is outweighed by any flood protection benefits conferred on plaintiffs by the MRRP only.

The "but for" world the court used for purposes of determining whether there can be a taking in this case is also consistent with the "but for" world referenced in the Federal Circuit's decision in *St. Bernard Parish*. In *St. Bernard Parish*, the Circuit considered the MRGO and LPV together because both were "directed to the same risk that is alleged to have caused the injury to the plaintiffs." 887 F.3d at 1365. There was

"no question that the LPV project was directed to decreasing the very flood risk that the plaintiffs allege was increased by the MRGO project" and included "levees along the banks of MRGO." *Id.* Indeed, some "construction of the levees used some of the material dredged from MRGO." *Id.* The Circuit specifically indicated that it was not addressing a situation where, like here, "the risk-reducing government action preceded the risk-increasing government action." *Id.* at 1367 n.14. It is precisely for this situation the Circuit referenced *Hardwicke* and the significance the *Hardwicke* court placed on considering what was contemplated for determining the appropriate "but for" world under *Sponenbarger. Id.* (citing *Hardwicke*, 467 F.2d at 490-91). As stated in the court's reconsideration decision, the circumstances of this case fit squarely within the situation described above by the Federal Circuit in *St. Bernard Parish* which referenced *Hardwicke*.

In *Hardwicke*, the court considered whether the Falcon Dam, which decreased the risk of flooding, constituted a baseline to analyze the effects of the later completed Anzalduas Dam, a diversion dam which increased the risk of flooding. The court stated that "a buyer of land . . . knew or should have known that the flood control plan . . . contemplated the construction of both storage and diversion dams." 467 F.2d at 490. Thus, the court held that "the circumstances show sufficient nexus between Falcon and Anzalduas, sufficient probability that Anzalduas would come into being after Falcon, so that plaintiffs cannot base a taking claim on the hypothesis that they can garner the benefit conferred by Falcon, without deduction for the probable detriment when

Anzalduas comes into being too." *Id.* at 491. Here, the court's "but for" world for purposes of deciding if there has been a taking is consistent with *Hardwicke* because it has determined that the changes made to the Mainstem System and the BSNP by the MRRP were not contemplated at the time the Mainstem System and the BSNP were constructed.

The government's reliance on *Bartz v. United States*, 633 F.2d 571 (Ct. Cl. 1980), *Ark-Mo Farms, Inc. v. United States*, 530 F.2d 1384 (Ct. Cl. 1976), and *Laughlin v. United States*, 22 Cl. Ct. 85 (1990) to suggest that *Sponenbarger* should be read more broadly to require the court to ignore the Mainstem System and the BSNP as a baseline is not supported. To begin, the discussions of *Sponenbarger* in each of these cases was dicta; in each case the court found that the government had not caused the alleged flooding.[6] Moreover, the facts in the above-cited cases are plainly distinguishable from the facts in the present case.

In *Bartz*, the plaintiffs alleged a taking based on the construction and operation of the Coralville Dam. 633 F.2d at 572-73. The court found that the Coralville Dam was "a component of the comprehensive flood control plan for the Mississippi Water Basin." *Id.* at 573. Specifically, the plaintiffs argued that the Corps had changed the operating protocols of the Dam and that change caused a taking. *Id.* The court rejected the

---

[6] *Ark-Mo Farms, Inc.*, 530 F.2d at 1386 (holding "[n]o proof was made that Dam No. 2 or any other consequence of the project was the cause of the floods complained of"); *Bartz*, 633 F.2d at 577 (holding "[e]xcessive precipitation was the root cause of the flooding experienced by plaintiffs"); *Laughlin*, 22 Cl. Ct. at 114 ("Since plaintiff did not prove causation, no detriment to his property resulted from any act of the Government.").

plaintiffs' argument that the operating protocols had changed to benefit other landowners, *id.* at 573-74, and considered the relative benefits with and without the Dam, *id.* at 575 ("Each of the years . . . was analyzed for the potential of raising a crop, using two hypotheses: one, regulated flows with Coralville Dam in position, and two, unregulated flows without Coralville Dam."). In *Bartz*, the court only looked at the Dam and not the entire flood control plan for the Mississippi basin. As such, *Bartz* is consistent with the court's reading of *Sponenbarger*.

In *Ark-Mo Farms, Inc.*, the plaintiff alleged that the closing "Dam No. 2" caused a taking. 530 F.2d at 1385. Dam No. 2 was part of the "McClellan-Kerr Arkansas River Navigation System" with the primary purpose of "the creation of a navigation channel" but included "a number of flood control structures, all upstream from plaintiff's farm." *Id.* In conducting the relative benefits analysis the court considered the impact of the System as a whole. *Id.* at 1386. Unlike Dam No. 2 and the System in *Ark-Mo Farms, Inc.*, the court has determined in this case that, while related, the MRRP was created to address the Corps' ESA compliance and it does not have the same purposes as the Mainstem System or BSNP. It is for this reason that the court turned to the *Hardwicke* exception.

Finally, in *Laughlin*, the plaintiff claimed that both the "Bureau's operation of the Colorado River as a flood control project" and "the existence and/or operation of the Topack Marsh" resulted in a taking of the plaintiff's property by causing high water elevation. 22 Cl. Ct. at 101. The Topack Marsh itself was created "as an unanticipated consequence of the river control project." *Id.* at 89. Thus, in the relative benefits analysis,

the court considered benefits arising from structures on the River that were part of the flood control project (i.e. dams, reservoirs, levees) and the Marsh that plaintiff alleged caused high groundwater and high-water elevation. *Id.* at 112. The government argues that this case is relevant because the court relied on a "but for" world without both the Marsh and prior flood control projects. Tr. of Dec. 10, 2019 Oral Arg. 18:12-20. However, this case is, once again, distinguishable from the present case because in *Laughlin* the plaintiff alleged a taking by both the Marsh *and* the river control project. *See Laughlin*, 22 Cl. Ct. at 86 ("plaintiff ascribes causation to the system of dams and reservoirs on the Colorado River and to Topack Marsh, either independently of or in conjunction with each other."). Thus, the *Laughlin* court's construction of a "but for" world necessarily had to consider what would happen without the Marsh and structures that were part of the river control project. Here, in contrast, plaintiffs allege a taking based only on the MRRP.

By disregarding the fact that the MRRP and its ESA-related purposes were not contemplated when the Mainstem System and the BSNP were constructed, the government's proposed relative benefits test would mean that the government could take virtually all of plaintiffs' properties for the benefit of threatened and endangered species and their habitats without compensation because the plaintiffs' properties would be repeatedly flooded and may not even exist in the government's proposed "but for" world

without the Mainstem System and the BSNP. The plaintiffs, of course, purchased and developed their properties because the Mainstem System and the BSNP were in place.[7]

In this regard, the court finds the government's concern that this court's reading of *Sponenbarger* will result in government liability for any adjustment of flood-control benefits in a flood-control project unsupported. S*ee* Tr. of Dec. 10, 2019 Oral Arg. 52:21-53:9. The projects undertaken by the Corps to reengineer the River for the benefit of these plaintiffs, among others, has caused environmental impacts that were not contemplated when the Mainstem System and the BSNP were constructed. The MRRP requires the Corps to once again reengineer the River, this time for the benefit of threatened and endangered species. These changes have caused an increase in flood risk to plaintiffs' properties that was not contemplated when the Corps took its prior flood risk-reducing actions. This case does not involve a comparison between different flood risk-reducing actions by the Corps. While relative benefits derived from related projects for the same purpose must be considered together, here the purpose of the Corps' actions are different and were not contemplated at the time the Mainstem System and the BSNP were constructed. Thus, neither *Sponenbarger* nor any other Federal Circuit case mandates that the MRRP be combined with all the Corps' actions on the River for purposes of determining whether there has been a taking by flooding.

---

[7] The government's position is particularly at odds with the fact that the Corps has been allocated funds and authority to purchase land from willing sellers "to be converted to habitat for native Missouri River species." *Ideker*, 136 Fed. Cl. at 665.

Therefore, the government's motion to amend its answer to seek a defense to taking liability based on a relative benefits test that compares plaintiffs' flood risks with and without the Mainstem System and the BSNP is **DENIED**. As a matter of law this defense would be futile. However, as discussed above, to the extent the government has new evidence to show that the Corps has implemented measures to reduce flood risks that occurred after 2014 to address MRRP flooding risk, they may be presented in Phase II. As set forth in the court's December 10, 2019 Order (ECF No. 531), the next step in this litigation is the parties' submission of a joint status report, to be filed on February 27, 2020, after the close of fact discovery on February 24, 2020.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge