# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 14-183L
(Filed: November 25, 2024)

|  |  |
|---|---|
| **IDEKER FARMS, INC.,** *et al.*, | ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) |
| **UNITED STATES**, | ) ) |
| *Defendant.* | ) ) ) |

*Seth C. Wright*, Polsinelli PC, Kansas City, MO, for plaintiffs.  With him on the briefs were *David K. Schultz* (argued) and *E. Benton Keatley*, Polsinelli PC, Kansas City, MO, and *Benjamin D. Brown* and *Alexander J. Noronha*, Cohen Milstein Sellers & Toll PLLC, Washington, DC.

*Mark A. Pacella* (argued), Trial Attorney, Natural Resources Section, Environmental and Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant.  With him on the briefs were *Todd Kim*, Assistant Attorney General, and *Tara M. Lewis*, *Ashley M. Carter*, *Sarah Ruckriegle*, and *Tyler M. Alexander*, Trial Attorneys, Natural Resources Section, Environmental and Natural Resources Division, U.S. Department of Justice, Washington, DC.

**OPINION AND ORDER**[1]

***BONILLA, Judge***.

Nearly four hundred landowners, business owners, and farmers in six states along the Missouri River allege the U.S. Army Corps of Engineers (Corps)

---

[1] This case was transferred to the undersigned for adjudication on October 3, 2022, pursuant to Rule 40.1(b) of the Rules of the United States Court of Federal Claims (RCFC).  At that time, and continuing through December 6, 2023, the matter was pending before the United States Court of Appeals for the Federal Circuit on cross-appeals of interlocutory liability and damages issues.  *See Ideker Farms, Inc. v. United States*, 71 F.4th 964 (Fed. Cir. 2023), *reh'g en banc denied* (Nov. 29, 2023) (per curiam); ECF 710 (mandate issued on December 6, 2023).

intentionally contributed to and directly caused atypical flooding of their properties. Plaintiffs contend the destructive floods flowed from official policy changes implemented by the Corps beginning in 2004, deprioritizing flood control and land and economic development in the region in favor of returning the river to a more natural state to protect wildlife and preserve the environment. Certain plaintiffs claim near-annual flooding beginning in 2007, which has devastated their land, damaged permanent and temporary fixtures, and destroyed crops and miscellaneous personal property. Others base their claims on one or two—but not yet three—flood events over the last twenty years.[2] Nevertheless, all plaintiffs claim the Corps' actions resulted in a permanent flowage easement across their land, effecting a taking of their real and personal property without just compensation in violation of the Fifth Amendment to the United States Constitution.

Pending before the Court is defendant's motion for judgment on the pleadings pursuant to RCFC 12(c). Specifically, defendant seeks to summarily terminate all plaintiffs whose takings claims are based upon less than three floods, asserting that such actions are tortious trespasses falling outside this Court's statutorily prescribed jurisdiction. *See* 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department . . . in cases *not sounding in tort*.") (emphasis added). The Court rejects defendant's oversimplification of the law in this complex area and concomitant effort to establish a bright-line rule of jurisdictional expediency at the expense of potentially viable Fifth Amendment claims. Put another way, the Court does not subscribe to the government's proverbial approach: Once is an accident. Twice is a coincidence. Thrice *might be* a pattern.

## BACKGROUND[3]

Early on in this litigation, the Court selected forty-four representative plaintiffs to examine issues of liability.[4] *Ideker Farms I*, 136 Fed. Cl. at 659. After hearing from the bellwether plaintiffs and the parties' other fact and expert witnesses

---

[2] To date, counsel identified thirty-five plaintiffs whose claims in this action are based upon fewer than three flood events occurring in or after 2004. ECF 731. The Court understands this number may eventually exceed 200 based on the allegations in the 2020 second amended complaint and representations of counsel.

[3] The background facts and procedural history are detailed in the Court's prior decisions in this case. *Ideker Farms, Inc. v. United States*, 136 Fed. Cl. 654, 660–72 (2018) (*Ideker Farms I*), *reconsideration denied*, 142 Fed. Cl. 222 (2019) (*Ideker Farms II*); *Ideker Farms, Inc. v. United States*, 146 Fed. Cl. 413, 414–17 (2020) (*Ideker Farms III*); *Ideker Farms, Inc. v. United States*, 151 Fed. Cl. 560, 566–683 (2020) (*Ideker Farms IV*). They are also summarized in the Federal Circuit's interlocutory decision. *Ideker Farms*, 71 F.4th at 970–74. Those material to this decision are restated herein.

[4] For clarity, in certain cases a tract of land is jointly owned by multiple individuals or entities. The number of "plaintiffs" used herein more aptly refers to the number of properties.

during the Phase I trial, the Court concluded that fourteen plaintiffs demonstrated the requisite causation, foreseeability, and severity to effect a cognizable Fifth Amendment takings claim in the form of a permanent flowage easement.[5] *Ideker Farms I*, 136 Fed. Cl. at 659–60, 761–62. Accordingly, these plaintiffs would proceed to Phase II, where the government's affirmative defenses would be tested and issues of entitlement and just compensation would be explored. *Id.* at 660. Relevant here, each of the fourteen plaintiffs headed to Phase II were found to have suffered three or more flood events between 2007 and 2014 attributable to the Corps' 2004 policy changes (Property Nos. 13, 15–18, 20, 25, 27, 29–30, 33, 39, 41, 44).[6] *Id.* at 725–34, 738–45, 747–49, 755–58, 760–61.[7]

The Court further concluded that an additional fourteen plaintiffs established causation and foreseeability but had not yet demonstrated the requisite severity. *Id.* at 762. Twelve of these fourteen plaintiffs were found to have suffered two flood events attributable to the Corps' 2004 policy changes (Property Nos. 19, 21–24, 26, 28, 31–32, 38, 40, 43); the other two plaintiffs in this group demonstrated one attributable flood event (Property Nos. 35 and 42). *Id.* at 732–43, 745–47, 750–52, 754–60. Although approved to move forward in this litigation, the pressing issue of inevitable recurrence remains for this group of plaintiffs. *See Ideker Farms,* 71 F.4th at 980 n.8.

Finally, the Court dismissed the claims of the remaining sixteen plaintiffs for failure to establish causation. *Ideker Farms I*, 136 Fed. Cl. at 762–63. All but four of these plaintiffs based their takings claim solely on a 2011 flood event (Property Nos. 1–10, 12, 14), which the Court determined was not sufficiently attributable to the Corps' 2004 policy changes.[8] *Id.* at 721–24, 725, 726–27. The balance unpersuasively cited two or three floods including the discounted 2011 event (Property Nos. 11, 34,

---

[5] On appeal, the Federal Circuit concluded that this Court erred in applying the temporary flooding multi-factor test articulated in *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012), in reaching this result. *Ideker Farms*, 71 F.4th at 978–81. However, reevaluation is not necessary in light of the ultimate conclusions reached: a claimed categorical physical taking of plaintiffs' property by the federal government in the form of a permanent flowage easement.

[6] For clarity, the Court uses the property numbers assigned in the original opinion.

[7] Following a Phase II trial focused on three representative properties within this group (Property Nos. 17, 33, 41), the Court entered judgment in the aggregate amount of approximately $8 million plus interest (i.e., over $7 million in just compensation for the three flowage easements and an additional $1 million for levee repairs). *See Ideker Farms IV*, 151 Fed. Cl. at 560, 566–610; ECF 699. On appeal, as further explained *infra*, the Federal Circuit affirmed this Court's ultimate liability determination and did not disturb the $8 million judgment. *Ideker Farms*, 71 F.4th at 974–86. However, the appellate court vacated this Court's blanket determinations that claims related to crop losses and attributed to 2011 flooding were not compensable and remanded those issues for further evaluation. *Id.* at 986–90.

[8] Specifically, the Court found that the 2011 flood was not the result of any "single purpose" of the Corps to comply with the 2004 Master Manual and that the plaintiffs could not meet the causation or foreseeability requirements for that flood. *Ideker Farms I*, 136 Fed. Cl. at 691–94.

3

36–37). *Id.* at 724–25, 749–50, 751–53. On appeal, the Federal Circuit vacated and remanded this Court's findings and conclusions related to the 2011 flooding, effectively reinstating the claims of this final group of plaintiffs as well as the claims of all plaintiffs insofar as they relate to the 2011 flooding event.[9]

## DISCUSSION

For more than a century, the United States Supreme Court has held that recurring flooding on private property flowing from federal government policies and engineering and construction projects effects a flowage easement. When permanent, the government actions effect a Fifth Amendment taking of private property for the public good, for which just compensation is ordinarily due:

> "Where the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value, there is a taking within the scope of the 5th Amendment." . . . There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other.

*United States v. Cress*, 243 U.S. 316, 328 (1917) (quoting *United States v. Lynah*, 188 U.S. 445, 470 (1903), *overruled in part on other grounds by United States v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 312 U.S. 592, 598 (1941)). In deciding this motion, the Court assumes the policies of the Missouri River Recovery Program are permanent and that plaintiffs' flooding can be attributed to government action. Accordingly, the sole issue the Court must resolve today is whether the subclass of plaintiffs whose Fifth Amendment takings claims are based on fewer than three flood events over the last two decades have plausibly alleged "inevitably recurring" flooding on their property.

In determining whether government-caused flooding will inevitably recur, historical flood events, while certainly a data point to consider, are not dispositive. Black's Law Dictionary defines "inevitable" as "Certain to occur; impossible to prevent or avoid <an inevitable consequence>." Black's Law Dictionary 925 (12th ed. 2024). Thus, the Court must look not only to past events, but toward the future, to determine whether the actions of the Corps will inevitably inundate a particular plaintiff's property with flood waters and, thus, establish a permanent flowage easement. Contrary to defendant's assertion, the number of government-induced flood events a property owner experienced as of the filing of their complaint does not

---

[9] This Court's specific rejection of additional flood events originally claimed by this subgroup of bellwether plaintiffs was not disturbed by the Federal Circuit on appeal.

axiomatically determine the viability of their Fifth Amendment claim.  *See Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) (*Arkansas Game & Fish II*) ("We have recognized . . . that no magic formula enables a court to judge, in every case, whether a given government interference with property is a taking.").[10] On this issue, the ultimate question is not the number of floods to date, but rather whether the government has taken a permanent right of access to the land.  *Quebedeaux v. United States*, 112 Fed. Cl. 317, 324 (2013) ("Counting floods is not the controlling consideration.  The question, rather, is whether defendant has appropriated an interest for itself in the subject property—and that inquiry requires an examination of multiple factors, certainly beyond whether actual flooding has occurred once, twice, or even a dozen times."); *see Ideker Farms*, 71 F.4th at 980 ("Where the government takes a permanent right of access, akin to an easement in gross, even if used only intermittently, it is unquestionably an appropriation of the owner's right to exclude.").  The Court does not adopt defendant's proposed reading of "inevitably recurring" as requiring recurrence at the time of the complaint rather than in the future.  So long as there has been one such flood event and future flooding attributable to government action is certain to recur, a claimant is entitled to pursue their claim.  The Court declines defendant's invitation to summarily dismiss takings claims based upon historical flood counting without permitting plaintiffs to prove that government-induced flood waters will inevitably return.

The cases cited by defendant in seeking dismissal reinforce the decision reached today.  In *Cedar Point Nursery v. Hassid*, for example, the Supreme Court explained: "Isolated physical invasions, *not undertaken pursuant to a granted right of access*, are properly assessed as individual torts rather than appropriations of a property right."  594 U.S. 139, 159 (2021) (emphasis added).  The emphasized clause exempts the permanent flowage easements claimed by plaintiffs in this case from the tort arena.  *See Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 329–30 (1922) ("But even when the [government's] intent thus to make use of the claimants' property is not admitted, *while a single act may not be enough*, a continuance of them in sufficient number and for a sufficient time may prove it. Every successive trespass adds to the force of the evidence. . . . The fact that the evidence was not sufficient [when the claim was filed] does not show that it may not be sufficient [today].") (emphasis added), *quoted in Cedar Point*, 594 U.S. at 159.

Defendant's reliance upon cherry-picked lines from the Federal Circuit's decision in this case is similarly misplaced.  Distinguishing the permanent flowage easement claimed in this case from potential tort claims, the Federal Circuit explained:

---

[10] Mindful of the Federal Circuit's ruling that "*Arkansas Game & Fish II*'s multi-factor test does not apply to permanently recurring flooding[,]" *Ideker Farms*, 71 F.4th at 981, the quote above refers to the Supreme Court's general approach to Fifth Amendment takings claims.

5

> [W]hile not rigid, the trespass-versus-taking inquiry focuses on whether government actions are "[i]solated physical invasions, not undertaken pursuant to a granted right of access, [which] are properly assessed as individual torts rather than appropriations of a property right." *Cedar Point*, 594 U.S. at 159. For example, up to three flooding events "by themselves" do not qualify as (even a temporary) taking. *Nat'l By-Prod., Inc. v. United States*, 405 F.2d 1256, 1273 (Ct. Cl. 1969) (collecting cases); *see Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1357 (Fed. Cir. 2003) ("[I]solated invasions, such as one or two floodings . . . do not make a taking . . . but repeated invasions of the same type have often been held to result in an involuntary servitude." (quoting *Eyherabide v. United States*, 345 F.2d 565, 569 (Ct. Cl. 1965))); *see also Cary v. United States*, 552 F.3d 1373, 1381 (Fed. Cir. 2009) (collecting cases distinguishing permanent and intermittent flooding from isolated incidents). In sum, this inquiry essentially distinguishes a physical appropriation from an "occupancy that is transient and relatively inconsequential," such as a "truckdriver parking on someone's vacant land to eat lunch." *Hendler v. United States*, 952 F.2d 1364, 1377 (Fed. Cir. 1991).

*Ideker Farms*, 71 F.4th at 980–81 (certain internal citations modified).  Each example of tort-based isolated or limited (quantified) flooding events is readily distinguished from the allegation presented in this case: a permanent (albeit intermittent) flowage easement taken by the Corps in implementing the Missouri River Recovery Program. *See, e.g.*, *In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 250 (2019) ("[E]ven a single flooding event may give rise to a taking where the defendant uses a permanent structure to "purposely flood[] a property once and expressly reserves the right to do so in the future." (quoting *Quebedeaux*, 112 Fed. Cl. at 323)), *appeal pending sub nom. Ablan v. United States*, No. 23-1363 (Fed. Cir.) (docketed Jan. 10, 2023); *but see Fromme v. United States*, 412 F.2d 1192, 1196–97 (Ct. Cl. 1969) (intervening flooding of private property during government construction of channel and dam did not effect a Fifth Amendment taking due to its temporary nature; post-construction flooding estimated to recur every fifteen years did not satisfy the frequency requirement).[11]

---

[11] The *Fromme* court's recitation of precedent stating "that one flooding or two floodings of land attributed to the construction of nearby works by the Government cannot be regarded as a taking of a permanent interest in the affected land[,]" 412 F.2d at 1196 (citations omitted), is undermined by the fact that the cited cases say that proving inevitable recurrence in the future is essential to takings claims with only one or two floods.  *See N. Ctys. Hydro-Elec Co. v. United States*, 151 F. Supp. 322, 323 (Ct. Cl. 1957) ("In this action it is necessary for [plaintiff] to prove . . . that the . . . dam caused the ice jams and the consequent floodings, *and that such floodings will inevitably recur*.") (emphasis added), *cited in B Amusement Co. v. United States*, 180 F. Supp. 386, 389 (Ct. Cl. 1960) ("One flooding does not constitute a taking and the plaintiffs have failed to show by their evidence that the flooding which occurred in 1949 *will inevitably recur. This fact is essential to prove a taking*.") (emphasis added).

At this juncture, without affording plaintiffs the opportunity to demonstrate that government-induced flood waters will inevitably return to their land, the Court cannot summarily dismiss plaintiffs' takings claims for not occurring enough times as of the date they filed suit, or even today. Fifth Amendment takings jurisprudence is multifaceted and, as here, requires fact-intensive considerations that do not lend themselves to the bright-line "three floods minimum" advocated by defendant. *See, e.g.*, *Quebedeaux v. United States*, 112 Fed. Cl. at 325 & n.12 (denying motion to dismiss takings claim based upon "a single recent flooding event" to afford plaintiff the opportunity to demonstrate the government effected a permanent flowage easement), *quoted in Orr v. United States*, 145 Fed. Cl. 140, 157–58 (2019) (similar). Consider the situation where the government constructs a project with the clear intent of regularly flooding adjacent private property in perpetuity. The effected landowners should not have to wait for their land to flood three (or more) times before filing suit seeking just compensation for the permanent flowage easement.[12]

To be clear, nothing in this opinion should be interpreted or otherwise construed as finding that any plaintiff currently claiming one or two flood events has made the requisite showing or otherwise carried their burden of demonstrating that the Corps has taken a permanent flowage easement across their land entitling them to just compensation. To establish liability and move on to the damages phase of this litigation, each plaintiff must present preponderant evidence that the Missouri River Recovery Program caused increased flood waters to flow onto their land *and* that flooding attributable to the Corps' actions will inevitably recur with sufficient frequency in the future. That is precisely what the Federal Circuit directed this Court to do on remand. *See Ideker Farms*, 71 F.4th at 980 n.8 ("To the extent stayed Plaintiffs' [sic] have not established that flooding will be permanently recurring, the trial court shall determine that where necessary on remand.").

---

Moreover, this flood-counting line of cases were overruled by the Supreme Court's temporary taking decision in *Arkansas Game & Fish II* and its progeny.

[12] Finally, the government claims the state law of prescriptive easements suggests that one or two floods is not enough to acquire an easement because the states where plaintiffs' property is located require at least ten years of adverse use before the acquisition of an easement by prescription. However, the question of what constitutes a Fifth Amendment taking is governed by federal law. *Banks v. United States*, 71 Fed. Cl. 501, 509 (2006) ("To the extent that plaintiffs' questions require construction of the Takings Clause of the United States Constitution, plaintiffs' questions are also governed by federal law.") (citing *Johnson v. United States*, 479 F.2d 1383, 1390 (Ct. Cl. 1973)); *see Bartz v. United States*, 633 F.2d 571, 577 (Ct. Cl. 1980) ("The court in *Johnson*[] held that the issue of what constitutes a 'taking' is a 'federal question' governed entirely by federal law, but that the meaning of 'property' as used by the Fifth Amendment will normally obtain its content by reference to state law.") (quoting 479 F.2d at 1390).

## CONCLUSION

For the foregoing reasons, defendant's request to terminate the subclass of plaintiffs whose Fifth Amendment takings claims are based upon fewer than three flood events or otherwise dismiss their claims (ECF 751) is DENIED.

It is so **ORDERED**.

Armando O. Bonilla
Judge